In re Interest of Joseph S. et al.,
children under 18 years of age.
State of Nebraska, appellee, v.
Kerri S., appellant.

___ N.W.2d ___

Filed October 9, 2015.    No. S-14-1025.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.

2. **Evidence: Appeal and Error.** When credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

3. **Parental Rights: Proof.** In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2014) exists and that termination is in the children's best interests.

4. **Parent and Child: Child Custody.** A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect.

5. **Parental Rights.** Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2014).

6. ____. One need not have physical possession of a child to demonstrate the existence of neglect contemplated by Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2014).

7. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

Appeal from the Separate Juvenile Court of Douglas County: Elizabeth Crnkovich, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Zoë R. Wade, and Lauren A. Walag for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer Chrystal-Clark, and Amy Schuchman for appellee.

Maureen K. Monahan, guardian ad litem.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## NATURE OF CASE

This case involving termination of parental rights first came before us in *In re Interest of Joseph S. et al.*[1] The State appealed to the Nebraska Court of Appeals the findings of the separate juvenile court of Douglas County that the three minor children of Kerri S. did not come within the meaning of Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2014) and that it was not in their best interests to terminate Kerri's parental rights. As a matter of first impression, the Court of Appeals held that a parent's noncompliance with a voluntary placement agreement that did not comport with procedural due process could not serve as a basis for termination of parental rights under § 43-292(2).

We granted further review, reversed the Court of Appeals' decision, and remanded the cause for further proceedings. On remand, the juvenile court concluded that the State had demonstrated by clear and convincing evidence that termination of Kerri's parental rights was appropriate and in the best interests of the children. We affirm.

---

[1] *In re Interest of Joseph S. et al.*, 288 Neb. 463, 849 N.W.2d 468 (2014).

## FACTS

Kerri is the biological mother of the minor children: Joseph S., William S., and Steven S. The family first came to the attention of the Nebraska Department of Health and Human Services (DHHS) on March 16, 2009. In that case, DHHS became involved with the family due to concerns about Kerri's drug use and improper supervision of the children. The children remained out of Kerri's care for exactly 1 year. In the fall of 2010, Kerri tested positive for cocaine. During the first case, Kerri did not consistently participate in services offered by DHHS, but ultimately completed a court-ordered and court-monitored plan, and the children were returned to her care. The case was closed in November 2011.

Shortly thereafter, in January 2012, DHHS received an "intake" reporting that Kerri had left the children with a relative and was unable to be reached. Calls to DHHS expressed concerns that Kerri was failing to properly supervise the children and that she might be using drugs.

Following this intake, Kerri was contacted by DHHS. Kerri agreed to a 180-day voluntary out-of-home placement of the children. In a voluntary placement agreement, a parent voluntarily signs an agreement that his or her children be state wards for 180 days, with either relatives or an agency, while the parent participates in rehabilitative services. In the present case, Kerri's brother and his wife took physical custody of the children during the 180-day placement period. At any time during the 180-day placement period, a parent can request his or her child to be returned, provided the parent has met certain requirements. Upon entering into the voluntary placement agreement, the case was referred to Nebraska Families Collaborative (NFC) for management with the goal of returning the children to the home. Kerri worked voluntarily with NFC from January until August 2012, which encompassed the duration of the placement agreement.

Melissa Misegadis, an employee with NFC, was the family's service coordinator in the first case and the family

permanency supervisor in the second case. Misegadis testified that in the first case, various services were offered to the family, including supervised visitations; family support; peer-to-peer mentoring; mental health services, including individual and family therapy; random drug testing; and psychotropic medication management. Misegadis again had contact with the family after receiving an intake on January 12, 2012, less than 3 months after the first case closed. Misegadis testified that as a supervisor, the family permanency specialist (FPS) reported to her and it was Misegadis' duty to determine whether a parent had complied with services and to ensure the safety of the children. Misegadis attended at least two family meetings with Kerri and her FPS. At the first meeting, Kerri denied using drugs and agreed to submit to drug testing.

Brenda Alvarado was the drug test specialist responsible for testing Kerri. Beginning in January 2012, at the outset of the placement period, Kerri was required to be drug tested weekly. While Kerri was Alvarado's client, Kerri had three "non-negative" or "positive" drug testing results—one in January for amphetamines; another in April for amphetamines, methamphetamine, and marijuana; and a third in May for methamphetamine. Kerri was present each time Alvarado received the preliminary drug testing results, and Alvarado discussed the results with Kerri each time. Kerri admitted to smoking marijuana once, but denied having taken the other substances for which she tested positive.

In June 2012, the testing was increased to eight times per month and prior to any visits with her children. Beginning in July, Alvarado had difficulty contacting Kerri for her scheduled drug testing due to problems with Kerri's telephone. When Alvarado was unable to contact Kerri, Alvarado would either go to Kerri's house or contact her FPS. Alvarado went to Kerri's house four to five times per month, but from July through December, Alvarado was able to complete Kerri's required drug testing only one or two times. Most of the

successful drug testing was obtained during either family visits or "team meetings."

Nine days before the voluntary placement period was set to expire, Anne Petzel, the FPS assigned to the case conducted an unannounced home visit at Kerri's residence to check its safety. The visit revealed the home was in disarray, with piles of clothes, numerous beds without sheets, and graffiti on the walls, some of which made drug references. Petzel observed empty alcohol bottles around the home and approximately five unknown adults in the home who appeared to be residing there, including a woman sleeping on one of the mattresses. Kerri described them as friends there to help her get the home ready for the children's return and to paint the home. Several cans of paint were found, but not brushes, rollers, or other supplies.

Shortly before the voluntary placement period was set to expire, an affidavit for removal of the children was filed due to information about Kerri that NFC had received from the Omaha Police Department which concerned the safety of the children. Additionally, NFC had received reports from Kerri's family members that her visits with her children and participation in therapy had been extremely inconsistent. NFC also received information regarding Kerri's lack of participation in her regularly scheduled drug screening, leading to concerns of ongoing drug use.

On August 9, 2012, the State filed a petition alleging the minor children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). On December 19, the State amended its petition to further allege that the children came within the meaning of § 43-292(2) and that Kerri's parental rights should be terminated. The State alleged Kerri had substantially and continuously or repeatedly neglected and refused to give necessary parental care and protection to the children.

On March 8, 2013, Kerri moved to bifurcate the adjudication as to whether the children came within the meaning of

§ 43-247(3)(a) from the adjudication for termination under § 43-292(2). The juvenile court denied the motion to bifurcate and found that the children came within the meaning of § 43-247(3)(a). It ordered that the adjudication proceed to determine whether the children were within the meaning of § 43-292(2) and if terminating Kerri's parental rights was in their best interests.

After the petition was filed, the case was transferred from Petzel to Tiffany Martin, another FPS. Martin met with Kerri at two family team meetings in September 2012. Martin testified that at those meetings, she offered to set up supervised visits with the children, but that Kerri declined because she did not think the children would want a stranger to conduct them. Kerri's brother had previously conducted the visits, but no longer wanted to do so because of Kerri's inconsistency in participation. On several occasions, Martin attempted to help set up a psychiatric evaluation for Kerri.

In November 2012, Martin met with Kerri, who told her that she no longer had her own residence, but was living at a friend's house. Martin denied Kerri's request to have supervised visitations at her friend's house.

Due to a lack of compliance with services in October and November 2012, Kerri's parenting time was discharged. Although visits with the children were still allowed in December, Kerri did not participate in such visits except for approximately 10 minutes on Christmas. From January to March 2013, Kerri met with her children on only two occasions.

Following our remand, an adjudication hearing was held on October 16, 2014. The State adduced evidence from both the 2009 case and the present case. Both cases involved the children's being placed outside the home for concerns of improper supervision and Kerri's drug use. Misegadis, Alvarado, Petzel, and Martin all testified on behalf of the State. Kerri testified in her own behalf.

On October 28, 2014, the juvenile court found by clear and convincing evidence that the children were within the

meaning of § 43-292(2) in relation to Kerri and that it was in their best interests to terminate Kerri's parental rights. The court ordered the children to remain in the custody of DHHS for adoptive planning and placement. Kerri timely appealed the juvenile court's order.

## ASSIGNMENTS OF ERROR

Kerri argues that the juvenile court erred in finding clear and convincing evidence the children came within the meaning of § 43-292(2), that termination of Kerri's parental rights is in the children's best interests, and that the juvenile court abused its discretion in denying Kerri's motion to bifurcate. As in her first appeal, Kerri asserts that her due process rights were violated when she entered into the voluntary placement agreement.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[2] When credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.[3]

## ANALYSIS

We first address Kerri's arguments relating to alleged violations of her due process rights. Kerri and the guardian ad litem for the children assert that Kerri was denied due process when the juvenile court terminated her parental rights based on her participation in a voluntary placement agreement with DHHS. She claims that she was coerced into entering the agreement and that the consequences or requirements of such agreement were not conveyed to her prior to her consent.

---

[2] *In re Interest of Nedhal A.*, 289 Neb. 711, 856 N.W.2d 565 (2014).

[3] See *In re Interest of Rachael M. & Sherry M.*, 258 Neb. 250, 603 N.W.2d 10 (1999).

We resolved this issue in our first review of this case. We noted that the record demonstrated that Kerri was afforded all of the due process requirements set forth in *In re Interest of L.V.*[4] We found that the record did not show that the coercive tactics used by state officials in cases cited by Kerri were present in the present case. Nor did Kerri argue that her compliance was not voluntary, and we declined to make such an assumption. We further found Kerri did not argue that the State lacked reasonable grounds in January 2012 for believing she was unable to properly care for the children, and the record does not support such a finding. In our instructions to the juvenile court on remand, we stated, "On remand, the juvenile court should consider all of the evidence presented to determine whether the State has demonstrated by clear and convincing evidence that termination of Kerri's parental rights is appropriate and in the best interests of the children."[5] Thus, we gave no instruction to determine whether Kerri's due process rights were violated when she entered into the voluntary placement agreement. Consequently, we decline to address this issue.

We next examine whether the State proved by clear and convincing evidence that termination of Kerri's parental rights was appropriate under § 43-292(2). We conclude that the State showed by clear and convincing evidence that termination of Kerri's parental rights was in the children's best interests and that she continuously or repeatedly neglected and refused to provide necessary parental care and protection.

[3-5] In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests.[6] One such

---

[4] *In re Interest of L.V.,* 240 Neb. 404, 482 N.W.2d 250 (1992).

[5] *In re Interest of Joseph S. et al., supra* note 1, 288 Neb. at 471, 849 N.W.2d at 475.

[6] *In re Interest of Walter W.,* 274 Neb. 859, 744 N.W.2d 55 (2008).

ground is when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.[7] A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect.[8] Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2).[9]

At the adjudication hearing, the State showed that in the first case in March 2009, DHHS became involved with the family due to concerns about Kerri's drug use and improper supervision of the children. Misegadis testified that in February 2010, the children had been returned to Kerri's care, but that they returned to foster care shortly after Misegadis became involved in the case. The children were removed from the home for exactly 1 year from July 2010 to July 2011. The case was closed in November 2011. Kerri was referred to aftercare for assistance "if things didn't go as planned." It was up to Kerri to engage in such services, but she never did so.

Less than 3 months after the first case closed, DHHS received an intake reporting that Kerri had left the children with a relative and that Kerri could not be reached. The intake expressed concerns that Kerri was not properly supervising the children and might be using methamphetamine. These were the same concerns that were presented in the first case and demonstrated that Kerri had not made progress toward rehabilitation.

With respect to Kerri's participation in voluntary services, the record shows a consistent pattern of noncompliance. In her

---

[7] § 43-292(2).

[8] *In re Interest of L.C., J.C., and E.C.*, 235 Neb. 703, 457 N.W.2d 274 (1990).

[9] *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

voluntary placement agreement, Kerri agreed to a chemical dependency evaluation and therapy. Therapy was later discharged due to noncompliance from Kerri. During the 180-day voluntary placement agreement, drug testing on three occasions showed the presence of various drugs in Kerri's system, including amphetamines, methamphetamine, and marijuana. Kerri subsequently became very inconsistent in her required drug testing. Despite the requirement of drug testing eight times a month, Kerri submitted to drug testing only once or twice between July and December 2012.

Kerri was also inconsistent in visitations with her children when these were supervised by her relatives. As a result of this inconsistency, her relatives were unwilling to continue supervising visits. When visitations were established with Nebraska Children's Home Society, Kerri was noncompliant in October and November 2012, resulting in discharge of this service. Kerri has also missed family team meetings, designed to discuss the progress of Kerri's case.

The record shows that Kerri has also repeatedly failed to put her children's needs ahead of her own by not providing a safe environment. Nine days prior to the anticipated return of the children to Kerri's home following the voluntary placement agreement, a visit by Petzel, an FPS, revealed the home was in disarray, with graffiti on the walls which included drug references, empty alcohol bottles around the home, numerous unmade beds without sheets, and approximately five unknown adults in the home who appeared to be residing there. NFC received information from relatives of Kerri, as well as information from law enforcement, which raised additional concerns about Kerri's ability to care for the children and provide a safe environment for them. In November 2012, Kerri requested to have visitations at a friend's house because she no longer had her own residence.

[6] Although much of the above-described conduct occurred while the children were not in the custody of Kerri, we have held that one need not have physical possession of a

child to demonstrate the existence of neglect contemplated by § 43-292(2).[10] Based on the record, we find clear and convincing evidence establishes that Kerri substantially and continuously or repeatedly neglected to provide the children necessary parental care and protection.

[7] Because the State met its burden with respect to neglect, we turn to whether the State established by clear and convincing evidence that termination was in the best interests of the minor children. Generally, when termination is sought under other subsections of § 43-292, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse.[11] In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.[12]

Misegadis testified that when the first case was closed in November 2011, she had concerns that Kerri might go back to her "old ways." Less than 3 months later, after having recently spent 1½ years working with Kerri on the same issues, DHHS received an intake regarding Kerri's drug use and improper supervision of the children. During the temporary placement period, Kerri continued using drugs and failed to consistently participate in mental health, drug, and family services. Misegadis testified that she does not know what other services could be offered to Kerri that have not already been offered. The record establishes that Kerri has been afforded ample opportunity to rehabilitate and improve herself, but has failed to avail herself of the services offered.

We examine the best interests of the children in the context of Kerri's repeated failure to provide a safe, stable, and

---

[10] *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

[11] *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

[12] *Id.*

drug-free environment for the children. Kerri's actions did not reflect her concern for the best interests of the children. Her failure to attend visitations with the children demonstrates a lack of motivation for reunification. The inconsistency in her attendance at the visitations led her own family members to decline to continue their supervision.

The record shows that the children have remained in foster care with only limited supervised visitations with Kerri since being removed from Kerri's home. The minor children have been out of the home for more than 3 years in the present case and for a year in the preceding case. NFC workers testified the children are well adjusted to their current placement. Martin opined that the children need to have permanency provided to them and that the children are in an adoptive home where their stability and safety needs are being met.

We agree that constant movement of the children into and out of foster care is not advisable or in the best interests of the children. The evidence related to best interests of the children was largely derived from the history associated with the various rehabilitative and reunification services which had been offered to Kerri and her children. Based on the record, the State established by clear and convincing evidence that it was in the best interests of the minor children that Kerri's parental rights be terminated. We reject Kerri's assignments of error in which she claimed that the evidence was insufficient to terminate her parental rights under § 43-292(2).

CONCLUSION

For the reasons stated above, we affirm the juvenile court's order.

AFFIRMED.