IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KARALIE M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KARALIE M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KAYLA S., APPELLANT.


Filed October 23, 2018.    No. A-18-388.


Appeal from the County Court for Buffalo County: JOHN P. RADEMACHER, Judge. Affirmed.

Jennifer N. Rowling, of Tye & Rowling, P.C., L.L.O., for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee.

D. Brandon Brinegar, of Ross, Schroeder & George, L.L.C., guardian ad litem.


MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Kayla S. appeals from an order of the county court for Buffalo County, sitting as a juvenile court, terminating her parental rights to Karalie M. For the reasons set out below, we affirm.

## BACKGROUND

Kayla is the biological mother of Karalie, a minor, born in 2011. Because of the unusual trauma involved in this case, a detailed background is helpful. It appears that Kayla was approximately 15 years old when she became pregnant with Karalie, which she asserts was the

result of a sexual assault. Additionally, Kayla was the victim of incest, but the specifics of this are not contained in our record. Following the birth of Karalie, Kayla and Karalie lived intermittently with Kayla's grandmother, Karen L., while Kayla attempted to finish high school and then, alternately, to obtain her GED. At times, Kayla would leave Karalie with Karen while Kayla pursued educational opportunities both in and out of Nebraska. At some point, Kayla moved to Iowa and was subsequently sex trafficked, culminating in a hospital stay in Chicago. She was returned to Nebraska, where she moved back in with Karen and Karalie in early September 2015.

Approximately 2 weeks after her return to Nebraska, Karalie came to the attention of the Department of Health and Human Services (DHHS) when Kayla and Karalie were picked up by Kearney police officers as Kayla was attempting to walk from Kearney to Omaha. Karalie was dirty, disheveled, and smelled of urine when DHHS first contacted her.

The State of Nebraska filed a petition to adjudicate Karalie pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based upon no fault or habit of Kayla. Pursuant to a no contest plea, the State's petition was granted and Karalie was placed in the foster care of Karen.

Kayla was diagnosed with post-traumatic stress disorder. As part of its case plan for Kayla, DHHS indicated that she needed to address her mental health issues before she could be reunited with Karalie. At the time that DHHS became involved with Kayla and Karalie, Kayla was seeing a therapist 10-12 hours per week. This treatment ended in December 2015 when Kayla discontinued her medications against her therapist's wishes. Kayla did not meet consistently with a therapist again until December 2016. However, those sessions were intermittent and ended in March 2017. Kayla and her therapist did not address her trauma or mental health, but, rather, discussed visitations with Karalie and Kayla's frustrations with her mother and Karalie's father.

While Karalie was in foster care, Kayla often was not in Nebraska. In February 2016, Kayla went to Arizona to live with her father and then her aunt. While in Arizona, Kayla went to a counseling center and did an intake; however, she did not sign a release allowing DHHS to receive information regarding her treatments. Kayla returned to Nebraska in May, but she left for Arizona again less than a month later. Kayla indicated that she was at a domestic violence shelter in Arizona, but did not sign a release allowing DHHS to receive information regarding what treatment or counseling she received there.

After returning to Nebraska in November 2016, Kayla left for a treatment center in Colorado for a short period. Again, Kayla did not sign a release allowing DHHS to determine what sort of treatment she received. Moreover, DHHS arranged for a psychological evaluation on two occasions in Nebraska, neither of which Kayla attended. Another psychological evaluation was scheduled when Kayla was in Arizona in April 2016, but she did not attend that appointment either. The completion of a psychological evaluation would have allowed DHHS and Kayla's therapists to better address her mental health. Finally, Kayla was not present at the termination hearing, and it is believed that she was in New York.

After Kayla's failure to work with DHHS to address her mental health, the State filed a motion to terminate Kayla's parental rights to Karalie. Karalie's father voluntarily relinquished his parental rights and therefore his rights are not at issue in this appeal.

At trial, the State presented testimony from several witnesses including three workers who supervised Kayla's visits with Karalie. Lacey Farrington testified that supervised visitations began

in November 2015. Farrington indicated that when Kayla was having a good day, the visitations went well and she could be a loving and caring mother to Karalie. However, more often than not, Kayla was not having a good day and would not engage with Karalie. At one such visit, Kayla's behavior was so erratic that Farrington was on the verge of texting her supervisor that she did not feel safe with Kayla. On another visit, while Kayla was cooking food for Karalie, she became so upset with her mother that she went to her room and remained there with a blanket over her head, leaving the food unattended on the stove. Numerous visits ended early due to Kayla not being prepared to care for Karalie or because of the fighting between Kayla and her mother.

Rachel Bliven, a family services specialist, testified that there were times that Kayla was "MIA" and that DHHS did not know where she was. Bliven additionally testified that more than half of the scheduled visits and family support sessions with Kayla were cancelled because she did not show up. Moreover, Bliven testified that Karalie would revert to a "baby state" while she was with Kayla and would use "baby-talk" and insist on being held like a baby.

Ruth Jones, a visitation worker, also testified that between June 2017 and August 2017, Kayla had just two visits with Karalie. Numerous visits during this time were cancelled because Kayla did not show up. Each of the witnesses that testified indicated that Kayla showed minimal improvement during the course of the visits.

The State presented testimony from Karalie's therapist as well, who stated that Karalie was doing well in foster care and was where she needed to be developmentally. Additionally, the therapist testified that early stability in young children is important, and children need a secure primary care giver that is able to meet their needs. The therapist also indicated that Kayla has not participated in child-parent psychotherapy with Karalie, which helps build a secure bond between the child and parent.

Following the trial the court found the State presented clear and convincing evidence that Kayla's parental rights should be terminated pursuant to Neb. Rev. Stat. § 43-292(2), (5), (6), and (7) (Reissue 2016) and that termination was in Karalie's best interests. Kayla appeals.

## ASSIGNMENTS OF ERROR

Kayla assigns, restated, that the county court erred in finding the State proved by clear and convincing evidence that statutory grounds for termination of parental rights of Karalie existed under § 43-292(2), (5), (6), and (7) and that it was in the best interests of Karalie to terminate Kayla's parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches conclusions independently of the juvenile court's findings. *In re Interest of Noah B. et al.*, 295 Neb. 764, 891 N.W.2d 109 (2017). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven. Further, clear and convincing evidence is

more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002).

ANALYSIS

For a court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied, and that such termination is in the child's best interest. *In re interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State must prove these facts by clear and convincing evidence. *Id.*

*Statutory Grounds for Termination.*

Kayla argues that the county court erred in finding that the State presented clear and convincing evidence that § 43-292(2), (5), (6), and (7) were satisfied. We disagree.

In its order terminating Kayla's parental rights of Karalie, the county court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (5), (6), and (7), which provides in relevant part:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection;
>
> . . . .
>
> (5) The parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period;
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination;
>
> (7) The juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months.

Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). See, also, *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.*

Here, it is undisputed that Karalie has been in out-of-home placement for more than 15 of the most recent 22 months. Karalie was placed in foster care in September 2015. The motion for

termination of parental rights was filed in October 2017 and the hearing was held in February 2018. Karalie remained in foster care throughout the case; thus, the statutory requirement for removal under § 42-292(7) has been met.

If an appellate court determines that one of the statutory grounds for termination under § 43-292 has been met, it need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). Because the State presented clear and convincing evidence that Karalie had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Kayla's parental rights exists.

*Best Interests.*

Kayla also argues that the county court erred in finding that it was in Karalie's best interests to terminate Kayla's parental rights. We disagree.

In addition to proving a statutory ground, the State must also show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected. Therefore, before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while they are separate, each examines essentially the same underlying facts. *Id.* The law does not require perfection of a parent; rather, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Aaron D.*, *supra*. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

Here, the State presented evidence demonstrating that Kayla was unable to consistently care for Karalie and was unable and unwilling to receive treatment to effectively manage her mental health. Establishing a clear timeline when Kayla had Karalie in her care is difficult from the record, but it appears that even before being trafficked, Kayla left Karalie with Karen for long periods of time. Following the recovery of Kayla from Chicago, Kayla had only been back in Nebraska for about two weeks when Kearney police found Kayla attempting to walk with Karalie from Kearney to Omaha late one evening in September 2015. Kayla was in a distraught, unhealthy

mental state, and Karalie was dirty, disheveled, and smelled of urine. Karalie was taken to Kayla's grandmother's house and Kayla was taken to her mother's house for an appointment that was scheduled in Omaha the next day. After that, Kayla was "MIA" and was thought to be in Arizona. Although Kayla returned to the Kearney area after the case was opened, there were many periods of time when she could not be located.

Throughout the case, Kayla did not adequately address her mental health issues, to the detriment of Karalie's best interests. Although Kayla was seeing a therapist 10-12 hours a week when DHHS first became involved, this treatment ended when Kayla stopped taking her medications against her therapist's recommendation. The record indicates that Kayla then went to Arizona for several months, where she did an intake at a treatment facility, as well as a women's treatment facility in Denver, and a domestic violence shelter in Arizona. However, Kayla would not authorize releases for information from those facilities, and DHHS did not receive any information regarding her stay or any treatment she may have received.

Further, while Kayla did begin meeting with a new therapist in Loup City in December 2016, these meetings did not address her trauma or mental health. Whenever the therapist attempted to address incidents reflecting on her mental health, Kayla would deny any corrective behavior that was offered. Instead, Kayla talked only about her visits with Karalie and her frustrations with Karalie's father. Kayla's inability to address or discuss behavior brought up by the therapist prevented the two from making progress in addressing the trauma that Kayla suffered as a result of being sex trafficked.

Moreover, numerous therapy sessions were cancelled by Kayla either in advance or because Kayla did not show up to the appointments. According to Kayla's therapist, victims of sex trafficking have a difficult time trusting others, and it takes a long time for a victim to trust another enough to begin to address their trauma. Kayla's missed sessions with her therapist did not allow a trusting relationship to develop, and prevented Kayla from addressing her trauma.

Throughout the pendency of DHHS' involvement, Kayla refused to have a psychological evaluation done. Kayla's therapist attempted to have multiple psychological evaluations done, including one which could occur while Kayla was already visiting her grandparents in the hospital. Kayla, however, did not go through with the evaluations. A different evaluation was scheduled to occur while Kayla was with her father in Arizona, but Kayla did not attend the appointment. Additionally, Kayla refused to provide releases for DHHS to receive records from any treatment facilities that she may have attended.

Without the results from a psychological evaluation, and without records from the treatment facilities that she attended, DHHS has been unable to provide Kayla with the help she needs. Kayla has demonstrated that she is unable and unwilling to receive treatment for her mental health issues, which is detrimental to Karalie's best interests.

Kayla's inability and unwillingness to properly address her mental health prevented her from consistently providing for Karalie. Kayla would often leave Nebraska for long periods without notifying anyone. While she was in the state, numerous visitations with Karalie were cancelled by Kayla, often without notice to DHHS. Kayla's visits with Karalie were always supervised by a DHHS representative. When Kayla was having a good day, she could be a competent parent to Karalie. However, more often than not, Kayla would be having a bad day and

would be unable to care for Karalie. During these bad days Kayla would argue with her mother and swear in front of Karalie, causing her to become upset. Kayla would also become aggressive and confrontational with the DHHS employee causing visitations to end early or be cancelled altogether.

It is clear from the record that Kayla has been victimized in several ways; however, it is Karalie's best interests that are of primary consideration in determining whether Kayla's parental rights should be terminated. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Karalie has been with her foster parent for 2½ years, and Karalie's therapist indicated that she is doing very well and is where she needs to be developmentally. The therapist also testified that early stability for Karalie is important, and she needs a secure primary caregiver that is meeting her needs.

During the visitations between Kayla and Karalie that did occur, Karalie regressed to "baby-talk" and wanted to be comforted like a baby. Karalie would also imitate Kayla's dissociative behavior, such as balling her hands into fists and staring off into the distance. Moreover, Kayla's ongoing mental health issues prevented her from participating in child-parent psychotherapy, which helps establish a secure bond between the child and primary caregiver. Overall, Karalie's therapist indicated that it would be in her best interest to be placed permanently in the care of her foster parent.

From our de novo review of the record, it is clear that Kayla experiences significant trust issues as a result of prior trauma. Even if Kayla proved willing to undergo treatment for her trauma, it would take a significant amount of time for a therapist or doctor to establish enough trust with Kayla to effectively address her trauma. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015).

The State presented clear and convincing evidence that termination of Kayla's parental rights is in Karalie's best interests. While Kayla did have good days in which she properly cared for Karalie, the record indicates that there were far more bad days where she could not care for Karalie or herself. Kayla has been unable and unwilling to receive the treatment she needs to be an adequate parent, and Karalie cannot wait for her to do so. Upon our de novo review of the record we find that the State proved by clear and convincing evidence that termination of Kayla's parental rights is in Karalie's best interests.

## CONCLUSION

We conclude that the State proved by clear and convincing evidence that grounds for termination of Kayla's parental rights existed under § 43-292(7), and that termination is in Karalie's best interests. We therefore affirm the county court's order terminating Kayla's parental rights to Karalie.

AFFIRMED.