IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF YELENA C. & CORTEZ C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF YELENA C. AND CORTEZ C., JR.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CORTEZ C., APPELLANT, AND ARIANNA P., APPELLEE.

Filed April 19, 2022.   No. A-21-589.

Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Affirmed.

Katie Jadlowski, of Bartling Law Offices, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Lindsey Stennis and Zachary Severson, Senior Certified Law Student, for appellee State of Nebraska.

Jane M. McNeil, guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Cortez C. appeals from the order of the separate juvenile court of Douglas County which terminated his parental rights to his two children Cortez C., Jr. (CJ), and Yelena C. On appeal, Cortez challenges the court's finding that termination of his parental rights was in the children's best interests and that he was an unfit parent. Upon our de novo review of the record, we affirm the juvenile court's order.

BACKGROUND

Cortez is the biological father of CJ, born in 2017 and Yelena, born in 2018. The children's biological mother is Arianna P. Arianna's parental rights to CJ and Yelena were also terminated during the present proceedings. However, the present appeal concerns only the termination of Cortez's parental rights. As such, we only discuss Arianna as is necessary to resolve the current appeal brought by Cortez.

On November 9, 2020, the State filed a petition alleging that Yelena and CJ were juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) by reason of the fault or habits of Cortez. Specifically, the State alleged Cortez subjected CJ to inappropriate physical discipline causing severe physical injuries. In addition, the State alleged that Cortez failed to provide proper parental care, support, and/or supervision for CJ and Yelena. The State further alleged that the children were at risk for harm.

On the same day, the State filed an ex parte motion for immediate custody. The State requested an order that would take the children into the custody of the Nebraska Department of Health and Human Services (the Department) for placement into foster care. In support of its motion, the State included an affidavit from a law enforcement officer who was dispatched to Children's Hospital in Omaha on the previous day based on reports of a 3-year-old child with bruising on his arms and abdomen. When the officer arrived at the hospital, he identified the 3-year-old child as CJ. The officer spoke with a social worker who advised him that CJ was brought to the emergency room by his grandmother, Lynnette, after she noticed that CJ had bruises on his arms and abdomen prior to giving him a bath. CJ explained to the officer that he received his bruises because "Daddy hit me." The officer also spoke with medical personnel at the hospital who explained that CJ's injuries included a laceration on his liver. The juvenile court granted the ex parte motion for immediate temporary custody.

On November 16, 2020, a first appearance and protective custody hearing was held. Cortez entered a denial to the allegations contained in the juvenile petition. In an order filed that day, the juvenile court found probable cause existed that CJ and Yelena were juveniles pursuant to § 43-247(3)(a) and that it was in the best interests of the children to remain in the temporary care and custody of the Department.

On March 11, 2021, the State filed an amended petition. Specifically, the State reasserted that the children were juveniles under § 43-247(3)(a) by reason of the fault or habits of Cortez because he subjected CJ to inappropriate physical discipline and caused severe physical injuries to CJ. The State further alleged that Cortez's parental rights should be terminated under Neb. Rev. Stat. § 43-292(2), (8), (9), and (10)(d) (Reissue 2016). The State alleged that Cortez continuously or repeatedly neglected the children and refused to give them necessary parental care and protection, Cortez inflicted serious bodily injury upon CJ by means other than accidental means, Cortez subjected the children to aggravated circumstance including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse, and because Cortez committed a felony assault that resulted in serious bodily injury to CJ. The State further alleged that the termination of Cortez's parental rights were in the best interests of the children.

Trial on the motion to terminate Cortez's parental rights was held over the course of four days from May 24 to June 1, 2021.

Cortez's mother, Lynnette, was called as a witness by the State. She testified that on November 8, 2020, Cortez called her. Cortez was upset with CJ because he "wouldn't stop doing something." She told Cortez to bring CJ over to her house. When Cortez arrived, CJ was upset and crying. She noticed that CJ had urinated and defecated on himself and needed a bath. While giving CJ a bath, she observed that CJ had a couple of small bruises on his stomach. According to Lynnette, CJ would not stop crying. She called her mom, Marsha, and they decided to take CJ to the emergency room at Children's Hospital in Omaha. While in the hospital, Lynnette heard CJ tell doctors that his dad hit him and that he was in a lot of pain. According to Lynnette, she then called Cortez on the telephone and the two of them began to yell at each other.

On cross-examination, Lynnette testified that CJ and Yelena lived with Cortez who was a single parent. She explained that although she helps Cortez a lot with the children, she believed that Cortez had been a good father. She also testified this was the first time that she had a concern for CJ's physical well-being while in Cortez's care. According to her observations, Yelena and CJ love Cortez and Cortez loves them, too.

Dr. Stephen Raynor, a pediatric surgeon employed by Children's Hospital, was CJ's admitting physician. According to Raynor, CJ presented with trauma and bruising to his upper abdomen and lower chest. Raynor conducted laboratory tests which confirmed that CJ had elevated liver enzymes. Raynor completed a CT scan which showed that CJ had a contusion on his liver. He testified that this injury would explain the high level of liver enzymes found. He also observed that CJ had a mild elevation of his pancreatic enzymes, but did not observe additional clinical problems with CJ's pancreas. Raynor explained that if the pancreatic enzymes were elevated for an extended period of time, CJ could suffer from pancreatitis. Finally, Raynor also observed that CJ had elevated creatinine levels which he determined were from an acute kidney injury. However, he did not observe any trauma to CJ's kidneys on the CT scan.

In Raynor's opinion, CJ's injuries were caused by blunt trauma to the abdomen. He testified that in children, the skeletal system does not absorb trauma in the same manner as an adult; rather, a direct blow to the abdomen will pass through the child's body and damage the internal organs. Raynor explained that it would take significant force to injure the pancreas. He testified that injuries of the kind experienced by CJ most typically result from motor vehicle accidents, bicycle accidents, or being hit by an object. He testified that the injuries could have been caused by either one or multiple impacts. He further testified that the liver contusion is a very significant injury, would result in significant pain, and could result in serious health problems depending on the extent of the injury. He did not find that any of the affected organs had continued to bleed, so surgical repair was not required.

Kristi Aldridge, a nurse practitioner who specializes in the area of child abuse and neglect also examined and provided care for CJ while he was a patient at Children's Hospital. Aldridge explained that upon admission, CJ had elevated enzymes stemming from his liver, pancreas, and kidneys, a laceration to the liver, a possible laceration to the spleen, and kidney damage. Externally she observed CJ to have significant bruising to his chest and upper abdomen. Upon admission, CJ was in significant pain and would not eat for a period of time. According to Aldridge, it is difficult to have bruises on the stomach because there is nothing hard behind the stomach. Aldridge explained that bruising on the chest would not typically occur without significant force, such as a motor vehicle accident, or by bicycling at high speeds and then his body hitting the handlebars.

She also testified that it was her understanding that CJ told medical personnel in the emergency room that his father had hit him. She opined that CJ's injuries were consistent with being punched in the chest and abdomen. She explained that the amount of force necessary to inflict his injuries would be significant.

Dr. Veronica Taylor, a pediatric nephrologist specializing in kidney disease, became involved in CJ's treatment the day following his admission to Children's Hospital after laboratory results showed a marked increase in creatinine in his blood. This finding indicated to Taylor that CJ had a significant kidney injury. CJ initially did not present with a kidney injury when he was seen in the emergency room; however, Taylor explained that kidney injuries can be delayed by 24 to 48 hours from the cause of the kidney injury. Based on Taylor's review, CJ's creatinine numbers were significantly elevated, peaking on November 10, 2020. She explained that creatinine is a marker of kidney function and is a molecule that is made by the body. Kidneys remove creatinine from the blood and excrete it in the urine. Based on her review, CJ's creatinine levels in his blood were more than three times the upper limit of normal for a patient. This indicates that due to the kidney injury, CJ's blood was not being cleaned appropriately. This in turn put him at risk for severe electrolyte abnormalities, decreased urination causing fluid overload, and ultimately death.

Taylor explained that at the height of CJ's injury, CJ's kidneys worked at most, at 25 percent of the expected kidney function. Urinalysis demonstrated a small amount of blood in his urine. Analysis of his blood also demonstrated the presence of metabolic acidosis. Taylor explained that acidosis is when the pH of the blood is too low. This in turn can cause injuries to other organs, worsen kidney injuries, and cause mental status changes, such as confusion and lethargy. In Taylor's opinion, acidosis constitutes a serious health risk.

Taylor opined about the cause of CJ's kidney injuries. She conducted an ultrasound of CJ's kidneys and determined that both were enlarged and bright. Taylor explained that the fact the kidneys were enlarged and bright showed some type of injury; however, just based solely on that observation, she was not able to determine what type of injury was caused to the kidneys. She explained that kidneys can be injured by physical force, infections, heart abnormalities resulting in blood pressure issues, and certain medications. In this case, Taylor was able to rule out all of the other possibilities that could have caused CJ's injuries. Ultimately, she determined that the cause of the injuries to CJ's kidneys was trauma. She testified that his injuries were consistent with being punched in the abdomen and chest. She explained that she typically sees this type of traumatic kidney injury when a patient is involved in a motor vehicle accident or is thrown from an all-terrain vehicle or a horse.

Taylor testified that because CJ's kidneys were only functioning at 25 percent the normal capacity, CJ had an increased risk of death. Taylor also explained that CJ's creatinine levels would have qualified him to be classified as having the most significant degree of kidney injury. Due to CJ's injury, Taylor explained that medical personnel would need to monitor CJ's urine output and electrolytes closely because of the possibility that CJ may need dialysis.

Due to the severity and extended nature of CJ's kidney injury, he remains under Taylor's care. Taylor testified that she last saw CJ in March 2021. Although his kidney function had by that point returned to normal, he continued to experience acidosis. As a result, CJ continued to be treated with medication. Whether the acidosis will resolve in the future is unknown. Taylor testified that due to this significant kidney injury, CJ will be at higher risk for future kidney injuries

and chronic kidney disease. As of the time of trial, Taylor opined that CJ will need to have his kidneys monitored at least twice per year. If he demonstrates continued improvement, he will only need to be monitored for his kidney function once per year. According to Taylor, CJ will require a lengthy period of recovery. She stated that his kidney injury is likely to have lifelong medical consequences.

Juan Jimenez, a detective with the Omaha Police Department, was alerted on November 9, 2020, that CJ had been brought to the hospital regarding some bruising to his abdomen. He talked to Aldridge and was given a description of CJ's internal injuries. Jimenez then contacted Lynnette at the hospital and asked her what had happened to CJ. According to Jimenez, Lynnette had received a call from Cortez that day. Cortez stated he was frustrated with CJ and she needed to come pick up CJ or he was going to "whoop his ass." Lynnette told him that when she heard this, she asked Cortez to drop CJ off at her house. When Cortez and CJ arrived, CJ was crying uncontrollably and was covered in feces. She took CJ from Cortez's vehicle. She then tried to give CJ a shower. At that point she noticed the bruising which prompted her to call her mother and ultimately take CJ to the emergency room.

Jimenez testified that it took several attempts for him to be able to make contact with Cortez and ultimately interview him. Jimenez noted that during his initial in-person contact, he explained that he was investigating an incident of child abuse and that Cortez had been mentioned in the initial report. Cortez's response to Jimenez was described as "flat" and without concern for his child. Cortez did agree to be transported to the police station to be interviewed.

Jimenez testified that Cortez related different accounts regarding what may have happened to CJ. Cortez first explained that around 11 a.m. on November 8, 2020, he asked the children if they needed to use the restroom. CJ denied that he needed to do so but Yelena said yes. Cortez took Yelena upstairs to use the bathroom and when he came back down, he observed that CJ was wiping his butt, having defecated on himself. Cortez admitted to Jimenez that he hit CJ on his forearms three times. Cortez told Jimenez that he then called Lynnette to watch CJ because he was frustrated with CJ. He later got a phone call from Lynnette and his grandmother who told him they were at the hospital. During the call they told him what the doctors had found concerning the bruising.

However, over the course of the interview, Jimenez explained that Cortez changed his version of events. Jimenez testified that Cortez later stated that CJ may have hurt his abdomen by falling from the steps and hitting himself on a toy car he and Yelena were fighting over. After Jimenez confronted Cortez with what the doctors had said regarding the severity of the injury, Cortez admitted that he previously hit CJ on past occasions but denied hitting CJ on November 8, 2020. He then admitted that there was an incident where he punched CJ three times in his abdomen on the previous day, Saturday, November 7. Cortez later altered that description to say that he grabbed CJ by the arms and then cocked his hand back and hit him one time hard with a closed fist, and then "tapped" him twice on the chest with an open hand. Cortez explained to Jimenez that Sunday was a lenient punishment day. Jimenez testified that he took this to mean that CJ "gets a break on Sunday; and from Monday through Saturday, that's when [CJ] gets abused more." During the course of the interview, Cortez did not ask questions about CJ's physical condition or placement, nor did he express remorse for his actions. During his interview with Cortez, Jimenez

was not able to determine whether Cortez had utilized physical discipline with Yelena. Cortez was arrested following his interview.

The case file of the criminal case was received at the termination trial. Cortez was criminally charged with one count of child abuse resulting in serious bodily injury, a Class II felony. Pursuant to a plea agreement, however, Cortez pled guilty to one count of attempted child abuse resulting in serious bodily injury, a Class IIA felony on March 2, 2021. On April 20, Cortez was sentenced to five years' probation with regard to this conviction. Based on the record, it appears that Cortez was in custody from the date of his arrest until March 2, when his bond was reduced. However, a no contact order remained in effect until the order of probation was entered.

After CJ was released from the hospital, both he and Yelena resided with Clarissa Wolf, the children's maternal great-aunt. The children resided there through January 2021 when they moved to the home of their paternal great-grandmother, Marsha. Clarissa testified that when CJ first began to reside with her, he would have night terrors. According to Clarissa, CJ would wake up in the middle of the night two or three times per month, crying and shaking. Clarissa explained that CJ would only go back to sleep after being comforted.

Ted Lampkin, the associate behavioral health director for the Charles Drew Health Center, provided parent/child interactive therapy (PCIT) to CJ. Lampkin testified that PCIT is a behavior modification therapy modality where the therapist is coaching the caregiver. Lampkin also explained that there is a two-way mirror with the therapist on one side and the caregiver on the other. The therapist would coach the caregiver through a microphone allowing the coach to provide instant feedback to the caregiver while the caregiver interacts with the child. By the time of the termination trial, Lampkin had provided six or seven sessions of PCIT to CJ and Marsha.

Lampkin acknowledged that CJ did not initially present with many concerning behaviors, although he ultimately diagnosed CJ with adjustment disorder. Lampkin explained that adjustment disorder presents when something significant has happened in the patient's life within the last six months which could be traumatic and is causing some distress. In Lampkin's experience, the symptoms of adjustment disorder vary but could include angry outbursts, difficulty sleeping, anxiety, and depression. Adjustment disorder typically lasts up to six months. In Lampkin's opinion, CJ being removed from his father and placed in another home would be a "huge" adjustment.

Katy Weir, a child and family services specialist employed with the Department, received an intake on November 8, 2020, regarding physical abuse of CJ administered by Cortez. According to the intake, CJ was brought to the hospital due to bruising on his torso, abdomen, arms, and hands. She began her investigation by speaking with Lynnette and observing CJ in the hospital. As part of her investigation, she spoke with Arianna who expressed that she was not surprised to hear of CJ's injuries, based on her past relationship with Cortez. She indicated that Cortez was abusive and had anger control issues. Weir opined that Cortez's parental rights should be terminated due to the extreme level of maltreatment demonstrated by Cortez toward CJ. She noted that the injuries inflicted could have been lethal.

On cross-examination, Weir conceded that she did not observe any injuries to Yelena. According to Weir, Cortez was not involved in any juvenile court case prior to November 8, 2020, and did not have any history with child protective services and had no violent criminal history. She also acknowledged that she has not observed Cortez interact with either Yelena or CJ.

Sally Guerra, a case manager employed with St. Francis Ministries, was assigned to work with CJ and Yelena beginning in November 2020. She testified that she was concerned with the children remaining in Cortez's care because of the injuries CJ suffered. She acknowledged on cross-examination, however, that she has not made firsthand observations of Cortez's relationship with Yelena. Rather, she explained that her concerns about the safety and well-being of the children were primarily based on how severely CJ was injured. She also testified that Clarissa notified her that CJ was traumatized by Cortez's abuse.

Guerra also had concerns with Cortez's visits with the children. According to Guerra, during visits, she needed to instruct Cortez to provide a meal or snack to the children. Cortez expressed to her that he wanted Lynnette or Marsha to provide a meal or snack to the children. Guerra also testified that there had been inconsistent visits between Cortez and his children because, in part, Cortez's work schedule would vary and would cause last-minute changes to the visits which were considered cancellations. Ultimately, Guerra opined that Cortez's parental rights should be terminated given the severity of the abuse suffered by CJ.

Cortez called two witnesses. Lily Koval is a visitation specialist with Beneficial Behavioral Health. She began supervising visits between Cortez and his children approximately three weeks before the termination trial. In her opinion, Cortez interacted with and was attentive to both of his children. She testified that she did not have to provide any redirection or feedback to Cortez regarding his interaction with the children. In her opinion, Cortez's actions during these visits indicated that he loved his children.

Cortez's grandmother, Marsha, testified that she had served as the children's foster parent since January 2021. She testified that she has not observed Yelena or CJ having night terrors or any behaviors that were atypical for two or three year old children following their visits with Cortez. She also explained that there has not been an increase in temper tantrums or angry outbursts from the children following visits with Cortez. It is her belief that the children and Cortez love each other.

After hearing arguments of counsel and taking the case under advisement, the juvenile court entered an order terminating Cortez's parental rights. The juvenile court first noted that the evidence did demonstrate that the children and Cortez have a bond and that Cortez was a single father. However, the juvenile court found Cortez's physical abuse of CJ to be of the utmost concern, noting that Cortez was currently on probation for a felony conviction stemming from such abuse.

The juvenile court specifically found that the testimonies of Raynor and Taylor were credible, probative, reliable, and entitled to weight. The court recounted each doctor's testimony that a significant amount of force was used to cause CJ's injuries. Specifically, the court noted that Raynor explained that the liver contusion would have been caused by blunt force trauma and that Taylor found that the injuries were consistent with being in a motor vehicle accident, falling from an all-terrain vehicle, or falling from a horse. The court also noted that Aldridge described the injuries as consistent with injuries that are normally associated with a motor vehicle accident or falling off of a bicycle at high speeds.

In addition, the juvenile court noted the severity of the injuries to CJ. The court noted the testimony of both Raynor and Taylor which described CJ's various injuries as extremely dangerous

to his life and health. The court noted Taylor's testimony that the injury to CJ's kidney will have lifelong implications and could yet lead to the need for future medical intervention.

The juvenile court also noted that Cortez was initially deceitful with police about the events leading to CJ's hospitalization and was only honest after being confronted with the mounting evidence against him. The juvenile court expressed its concern regarding three specific statements made by Cortez, those being that he may be "talking about another time," that "I have punched him [in] the stomach before," and that "yesterday was more of my lenient ass-whopping days." The juvenile court found that Cortez's actions were not a one time, accidental act of frustration; rather, it was likely that CJ and Yelena had received more severe punishment in the past. The juvenile court concluded that Yelena and CJ needed a future in which they can "flourish, make mistakes, and learn from it, free of any physical beatings from a parent."

As such, the juvenile court terminated Cortez's parental rights under § 43-292(2), (8), (9), and (10)(d). The court also found that it was in the best interests of both CJ and Yelena for Cortez's parental rights to be terminated.

Cortez now appeals to this court.

ASSIGNMENTS OF ERROR

On appeal, Cortez asserts that the juvenile court erred in terminating his parental rights because there was not sufficient evidence to establish that termination was in the children's best interests and there was not sufficient evidence to establish that Cortez is an unfit parent.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). When credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). The State must prove these facts by clear and convincing evidence. *Id.*
*Statutory Factors.*

The juvenile court found that the State presented clear and convincing evidence to satisfy § 43-292(2), (8), (9), and (10)(d). Cortez does not challenge the juvenile court's finding that statutory grounds to terminate have been met. However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(9) provides that termination of parental rights is justified when a parent has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. Whether aggravated circumstances under § 43-292(9) exist is determined on a case-by-case basis. *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). The Legislature has not defined

aggravated circumstances in the juvenile code, but the Nebraska Supreme Court has stated that where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated. *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003). The Supreme Court has also explained that aggravated circumstances exist when a child suffers severe, intentional physical abuse. See *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). This court has previously reversed a determination that there was sufficient evidence to show that the caregiver intentionally harmed the child where the only evidence presented at trial that the child was intentionally harmed was the medical testimony from a doctor. *In re Interest of Elijah P. et al., supra.* In contrast, this court has upheld the determination that there was sufficient evidence presented to show that the caregiver subjected a child to aggravated circumstances when the caregiver was the only person who provided care for the child during the timeframe the child would have sustained the injury, the caregiver did not offer any reasonable explanation for the injury, and the medical testimony was that abusive trauma was the only diagnosis for the injuries. *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020). In *Ky'Ari J.*, this court noted additional evidence which demonstrated that the caregiver exhibited violent behavior in the past. *Id.*

In the present case Cortez admitted punching CJ in the chest and abdomen the day before he was taken to the hospital. He also admitted that he had utilized physical strikes to CJ as a form of discipline in the past. Cortez asked his mother to take CJ on the day he was taken to the hospital because of his frustration with CJ and his desire to "whop" him further. The State showed by clear and convincing evidence that there was an unacceptably high risk to CJ's health, safety, and welfare as a result of the physical abuse perpetrated by Cortez. The medical testimony uniformly showed the serious, life-threatening nature of the injuries to CJ's liver and kidneys. His kidney function was reduced to 25 percent of its normal functioning. Taylor ruled out other diagnoses besides trauma that could have caused CJ's kidney injuries and the only evidence of actual trauma received was that meted out by Cortez. The force that CJ was subjected to was compared to the amount of force present in a motor vehicle accident, or a fall from an all-terrain vehicle or a horse. When first questioned by law enforcement, Cortez did not offer any reasonable explanation as to what caused the injuries to CJ. Rather, he attempted to explain to Jimenez that CJ's injuries were caused by falling on a toy car. Moreover, we also consider Cortez's past violent behavior. Cortez admitted to Jimenez that he has hit CJ in the past.

Upon our de novo review of the record, we find that Cortez subjected CJ to aggravated circumstances because CJ suffered significant injuries and was at an increased risk of dying as a result of Cortez's physical abuse. It is of no consequence that there was no evidence presented that Cortez also abused Yelena. Section 43-292(9) requires only that the parent has subjected the juvenile or another minor child to aggravated circumstances.

Because there is clear and convincing evidence that termination of Cortez's parental rights was warranted pursuant to § 43-292(9), we need not further address the sufficiency of the evidence to demonstrate that termination was also warranted pursuant to § 43-292(2), (8), or (10). See *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). We affirm the decision of the juvenile court which found a sufficient statutory basis to warrant termination of Cortez's parental rights pursuant to § 43-292(9).

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al., supra.* This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

The best interests' analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

In his brief on appeal, Cortez argues that the juvenile court erred when it determined that termination of his parental rights were in the best interests of CJ and Yelena. Specifically, Cortez argues that CJ and Yelena wanted to spend time together as a family and that Cortez demonstrated his commitment to preserving and healing his relationship with his children. Cortez also argues that the State did not prove that he was unfit as a parent because Cortez accepted responsibility for his wrongdoing and was ready and willing to engage with service providers.

It is true that portions of Marsha and Lynnette's testimony indicated Cortez had a bond with CJ and Yelena. Koval did not notice any difficulties with Cortez's care for the children during the visitations she observed. However, while Marsha and Lynnette stated their belief that Cortez could be a capable parent, it was they who acted to take CJ to the hospital when Cortez failed to do so. In fact, Lynnette intervened when Cortez called expressing frustration with CJ and was considering "whopping" CJ again. While we do not doubt these witnesses' sincerity, their opinions are significantly outweighed by the testimony regarding CJ's abuse and the circumstances surrounding it. We recognize that there was no evidence to show that Cortez abused Yelena. But there is no dispute that Cortez seriously abused CJ. As the Supreme Court has explained, the abuse of any child by an adult calls that adult's ability to parent into serious question. See *In re Interest of Ryder J., supra.*

This is particularly true here. The juvenile court found that both Taylor and Raynor were sufficiently credible for their testimony to be given weight. Their testimony indicated that both the laceration to CJ's liver and the injury to his kidneys were the result of significant trauma, equal to that seen in motor vehicle accidents. Simply put, CJ could have been killed by the blows inflicted upon him by his father. His kidneys may never fully recover and will be more susceptible to further infection and injury for the remainder of CJ's life. He requires two follow up examinations per year at this time to monitor his acidosis. These examinations may be a permanent fixture on his schedule.

We do not accept Cortez's argument that he took responsibility for his actions. As Jimenez testified, Cortez did not readily admit to what had occurred in November 2020. Rather, he minimized his actions. He changed his story when speaking with Jimenez multiple times, placing blame on CJ falling down the stairs and onto a toy car, for the injuries. Only when he was confronted with the medical evidence did he admit striking CJ.

Of equal concern is the fact that after severely injuring CJ, Cortez did not seek medical treatment for him. When he admitted punching CJ, Cortez told Jimenez that it happened on Saturday, the day before CJ was taken to the hospital. CJ was in extreme pain requiring the administration of morphine after being admitted. Cortez not only did not recognize the distress his son was experiencing, he became frustrated and was at the point of delivering further abuse when he called his mother. He did not take CJ to the hospital, nor did he come to the hospital when informed by his mother that she and her mother had taken CJ to the emergency room and that his injuries were severe.

The evidence presented at trial showed that CJ, then three years old, was hospitalized with injuries to major organs that were caused by blunt force trauma inflicted by Cortez, his father. CJ's life was endangered and he will continue to be at risk for future medical problems as a result of these injuries. These facts show that Cortez is not a fit parent for CJ and Yelena and that termination of his parental rights is in the children's best interests. The fact that Cortez has not yet abused Yelena is inconsequential. We need not wait for disaster to strike before taking productive steps in the interests of a minor child. Though we do not doubt that Cortez would like to reestablish a relationship with his children, the seriousness of the abuse inflicted coupled with his indifference to the critical needs of his child and his past history of abusive behavior make Cortez unfit to parent. We cannot find that it is appropriate to risk further harm to CJ and Yelena given the facts presented in this case.

We find the State has rebutted the presumption that preservation of the parent-child relationship between Cortez and his children is in the children's best interests. We agree with the juvenile court that Cortez's parental rights should be terminated.

CONCLUSION

Upon our de novo review of the record, we find that there was sufficient evidence presented to warrant the termination of Cortez's parental rights to CJ and Yelena. As such, the order of the juvenile court is affirmed.

AFFIRMED.