IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF AMARA W.B. & CARTER W.B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF AMARA W.B. & CARTER W.B.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KALI B., APPELLANT.


Filed August 23, 2022.    No. A-21-945.


Appeal from the County Court for Hall County: ALFRED E. COREY III, Judge. Affirmed.

Grady C. Erickson, of Burns, Koenig & Erickson for appellant.

Martin R. Klein, Hall County Attorney, and Sydney K. Pfeifer for appellee.


MOORE, RIEDMANN, and WELCH, Judges.

MOORE, Judge.

### INTRODUCTION

Kali B. appeals from an order of the Hall County Court sitting as a juvenile court, terminating her parental rights to two of her children. Upon our de novo review of the record, we affirm the juvenile court's order.

### STATEMENT OF FACTS

Kali is the biological mother of Amara W.B., born in December 2017, and Carter W.B., born in July 2019. The children share the same biological father. The juvenile court terminated the father's parental rights to Amara and Carter during these same juvenile proceedings. Because the father is not a part of this appeal, he will only be discussed as necessary.

- 1 -

The children were removed from the home on February 10, 2020, due to concerns regarding Kali's drug use. A petition was filed the following day to adjudicate Amara and Carter pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Kali testing positive for methamphetamines and refusing to participate in treatment, placing the children at risk of harm. The children were adjudicated in March 2020. They have remained out of the home since they were removed.

The juvenile court entered a dispositional plan on August 13, 2020, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Kali's case plan goals included addressing her substance use issues; finding positive and nonaggressive coping skills; and developing and maintaining a safety network. Two review hearings were held during the case; occurring on October 8, and January 7, 2021. The goals of the court adopted plans have been consistent throughout the case.

On May 12, 2021, the guardian ad litem (GAL) filed a motion for termination of Kali's and the father's rights in regard to the two children; alleging that statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and alleging that termination was in the best interests of the children.

The termination trial was held over the course of 2 days in October 2021. The State asked to join the GAL's motion to terminate Kali's parental rights at the start of the trial, which the juvenile court allowed. During the trial, 7 witnesses testified and 11 exhibits were received by the court.

Terri Bougger, a children and family services specialist for the Department, processed intakes related to Kali's children in September 2019, January 2020, and February 2020. The first intake alleged that Kali was using drugs in the presence of Amara and Carter. Bougger and a law enforcement officer met with Kali to investigate the allegation, and Kali admitted to using methamphetamines during the meeting. The officer administered a drug test and Kali tested positive for methamphetamines and marijuana. Bougger then instituted a safety plan, which required all of Kali's contact with her children be supervised. Kali told Bougger that she had a friend who was willing to provide such supervision.

One week later, Bougger and the officer returned to Kali's home to find that Kali's friend was not present and that Kali was having unsupervised contact with her children, thus violating the safety plan. The officer then administered another drug test to Kali, which was negative. Because Kali was not under the influence of any drug, Bougger testified that there was no longer a safety issue and the safety plan was discontinued. However, Kali agreed to work with family support services, and indicated to Bougger that she wanted assistance with budgeting.

In January 2020, Bougger received another intake based on concerns that Kali had driven her children to the office of her probation officer, where she then tested positive for methamphetamines. After several attempts to contact Kali, Bougger and the officer visited Kali at her home on February 4. During this visit, Bougger observed Kali to be agitated. After submitting to another drug test, Kali tested positive for methamphetamines.

Bougger discussed with Kali various options to keep the children in Kali's home. Kali agreed to a safety plan where her sister, who was then living in Kali's home, would provide constant supervision of Kali's contact with her children. Kali also agreed to check herself into a drug detox center, but Bougger testified that never occurred.

Bougger and the officer again made contact with Kali at her home on February 10, 2020. Bougger discovered that Kali's sister was home alone when Kali later returned with the children. Because Kali violated the safety plan by having unsupervised contact with the children, the officer again administered a drug test to Kali. Kali again tested positive for methamphetamines.

After Kali's positive drug test, the officer took Amara and Carter into emergency protective custody. Bougger placed the children with a former coworker of Kali's, whom Kali had identified as a preferential placement. At the time of their removal, Amara was 2 years old and Carter was 7 months old.

Following the removal of the children, Bougger again encouraged Kali to enter a drug detox center, and to complete a substance use evaluation. Despite Bougger offering Kali assistance setting up the evaluation and other family support services, Kali denied the services as "she was able to stop using in the past and felt that she could do it again."

Stephanie Medinger has been Kali's probation officer since January 2020. Kali began probation in November 2019 as the result of a misdemeanor shoplifting charge. Kali's probation requirements included that she "stay within the law," attend regular drug testing, and participate in dialectical behavioral therapy. However, Kali missed over fifty drug tests between March and August 2021, despite the condition that she be drug tested at least three times a week.

Medinger testified to a timeline of Kali's treatment programming. Kali obtained a substance use evaluation at the Saint Francis Alcohol and Drug Treatment Center (Saint Francis) on February 18, 2020, which recommended intensive outpatient treatment. Kali participated in intensive outpatient treatment at Saint Francis from March to April 2020, but Kali was unsuccessfully discharged after she "relapsed on THC."

Kali obtained another substance use evaluation through Friendship Home Counseling, which recommended residential treatment. Kali enrolled in residential treatment at Saint Francis on May 20, 2020, but was unsuccessfully discharged the following day. Kali then attempted to enroll in the Seekers of Serenity treatment center, but was placed on a waiting list. Seekers of Serenity reached out to Kali regarding an opening in their center in September, but did not hear back from her for several weeks. Kali was admitted to Seekers of Serenity in November, and successfully completed treatment the following month.

Part of Kali's aftercare recommendations from Seekers of Serenity were that Kali reside in a sober living environment, participate in weekly meetings, and attend drug testing. In December 2020, Kali moved into a transitional housing program, the Oxford House. Despite Medinger's preference that Kali stay at the Oxford House for at least 90 days after her successful discharge from Seekers of Serenity, Kali did not comply with the rules of the Oxford House and was asked to leave after only a few weeks.

Medinger recommended that Kali go to Hope Harbor, another transitional housing program, so that Kali would be in a sober living environment and in compliance with her aftercare recommendations. Kali was not interested in going to Hope Harbor and Medinger could not recall where Kali lived after she left the Oxford House. Because Kali was not following her aftercare recommendations, she was in violation of her treatment bond and a warrant for her arrest was issued.

At the time of trial, Medlinger reported that Kali was again on a waiting list for Seekers of Serenity's intensive outpatient program.

Serina Plympton, a children and family services specialist, was the Department caseworker assigned to Kali's case in July 2020. Kali's caseworker from February to July was no longer with the Department and was not called to testify. Plympton testified that she offered Kali a variety of services including supervised visitation with the children, family support, counseling options, and family funding. Plympton did not arrange for drug testing, as Medinger was administering drug tests to Kali and Kali had signed a release allowing the Department to communicate with Medinger.

Plympton noted that Amara exhibits aggressive behaviors and was referred to the Early Development Network for services. However, Kali was unwilling to work with the Early Development Network and that service was never initiated. Amara has instead seen a behavioral therapist for most of 2021, but Kali has never communicated with Amara's therapist to report concerns or request an update on Amara's progress. Kali also has not attended any of the children's medical appointments, but Plympton was unable to recall if she had ever informed Kali of the appointments.

Kali completed multiple substance use evaluations during her case, though Plympton was unable to recall the dates of the evaluations. Plymton's testimony regarding the timeline of Kali's treatment programing was consistent with Medinger's.

Kali had supervised visitation with her children throughout the entirety of the case. While Kali was in residential treatment, she participated in virtual visitation with the children due to restrictions caused by the COVID-19 pandemic. Plympton also testified that Kali was incarcerated for periods of time throughout the case. While Kali was incarcerated, she had telephone calls with her children in lieu of in-person visits.

Plympton testified that, at times, Kali would have "very hostile interactions with other adults around her." Plympton worked with Kali on identifying counselors that could assist her in developing coping skills. However, neither Plympton nor Kali were able to find any counselors to assist Kali. Kali did inform Plympton that she was attending counseling as part of her intensive outpatient treatment. Kali reported to Plympton that she was participating in sessions three times a week.

Plympton stated that she often struggled to keep in contact with Kali throughout the case; either because Kali would not attend scheduled appointments with Plympton, not answer Plympton's calls or text messages, or not inform Plympton that she had moved.

Plympton noted that Amara and Carter have been in the same placement since they were removed from the home in February 2020.

Laykin McCoy, the manager of the visitation workers who supervised Kali's parenting time, testified that Kali was generally "pretty consistent" with attending her scheduled parenting time. Starting in March 2021, Kali was offered 66 visits and five of those visits were canceled. McCoy did not find the number of canceled visits to be concerning. Kali was also engaged with her children during the visits and always came prepared with activities for the children and Kali to do together.

Ronda Jividen, a visitation worker, has been supervising Kali's visits with Amara and Carter since March 2021. While the visits generally went well, at times Jividen had safety concerns and provided Kali with redirection. Jividen never terminated a visitation due to a safety concern and reported that Kali was "often" open to her coaching. However, Kali never progressed beyond

supervised visits. No testimony was provided as to the specific safety concerns observed during Kali's parenting time, or why Kali had not progressed to unsupervised visits. Additionally, no visitation reports are attached to the Department case plans or otherwise included in our record.

The children's foster mother testified that Amara and Carter have been doing well in her home. The foster mother noted that she schedules the children's medical appointments but does not contact Kali to inform her of the appointments. She also testified that when the children return from visits with Kali, their demeanor changes. When asked if this behavioral change in the children was positive or negative, the foster mother responded that the children are "just different." The children are generally excited to know that they will be visiting Kali.

Kali testified on her own behalf. Kali's timeline of her treatment was consistent with Medinger's and Plympton's testimony. Kali testified that she was asked to leave the Oxford House due to her violating the house's curfew on two occasions.

Kali maintained that she has never used drugs in the presence of her children, as she used only while she was at work. However, a screening submitted into evidence reflects that, immediately after her removal, Amara's hair tested positive for environmental exposure to methamphetamines. Since her child welfare case began in February 2020, Kali estimated that her longest period of sobriety was 4 months.

Kali testified to incidents of domestic violence with the children's father; including when he struck her in December 2019, and attempted to stab her in January 2020. Additionally, the children's father would often yell at Kali, sometimes in front of the children. At the time of trial, the domestic violence between Kali and the father had subsided but she testified that he was still "trying to come around" her. She denied having any present contact with the children's father.

Kali detailed periods of time she was incarcerated during her child welfare case. She was incarcerated for 1 day in February 2020, 1 day in May, 14 days in October, 14 days in November, 33 days from February to March 2021, and 56 days from August to October. Kali attributed her jail sentences to unpaid tickets and fines, missed court dates, a revoked treatment bond, and criminal impersonation.

At the time of trial, Kali was working on an as-needed basis with a roofing and construction company, for which she was paid in cash. She was unsure if she had ever been ordered to pay child support. A certified copy of Kali's child support payment history was offered and reflected $721.77 in arrears.

Kali enjoys spending time with her children and described their favorite activities, such as playing soccer, driving toy cars, and painting. In addition to toys, Kali brings several supplies to her parenting time including vitamins, toothbrushes, diapers, wipes, spare clothing, food, and drinks. At the time of trial, Kali had 2-hour long visits, but previously had 4-hour long visits. No testimony was provided as to why this reduction in Kali's parenting time occurred.

Kali disputed Plympton's testimony that she was hard to reach. Instead, she testified that she was often unable to get ahold of Plympton. Kali noted that she frequently texted questions and updates to Plympton's cell phone, however she rarely received a response. Kali once asked if she could take her children to her grandmother's funeral and did not receive a response from Plympton.

Kali also noted that Plympton did not offer her relevant services. Kali, who does not have a driver's license, once asked Plympton for transportation assistance, and Plympton responded that the Department did not offer transportation services. When Kali asked Plympton for help in finding

a counselor, Plympton only provided Kali with information for counseling related to the relinquishment of parental rights.

Following the termination hearing, the juvenile court entered an order on November 8, 2021, terminating Kali's rights to Amara and Carter. The court found that the GAL and State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and (7). However, the GAL and State had failed to prove that reasonable efforts to preserve and reunify the family failed to correct the conditions which brought the juveniles into the child welfare system, pursuant to § 43-292(6). The court noted that the Department had failed to provide drug testing and counseling to Kali, and that there was conflicting evidence as to whether the Department had informed Kali of the dates of her children's medical appointments so that she may accompany them. The court further found that Kali was an unfit parent and that it was in the best interests of the children to have Kali's parental rights terminated.

Kali appeals.

ASSIGNMENT OF ERROR

Kali assigns that the juvenile court erred in terminating her parental rights.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

ANALYSIS

*Statutory Grounds for Termination.*

The juvenile court found that the GAL and State had presented clear and convincing evidence to satisfy § 43-292(2) and (7).

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Kali's home on February 10, 2020. The GAL filed the motion for termination of parental rights on May 12, 2021, and the termination trial was held in October 2021. The children remained out of the home since their removal in February 2020. At the time of trial, the children had been out of the home for 20 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate

court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the GAL and State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Kali's parental rights exists.

*Best Interests and Unfitness.*

Kali assigns that the juvenile court erred in finding that it was in the children's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, *supra*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their *de novo* review of whether termination of parental rights is in fact in the child's best interests. *Id*.

Kali concedes that she is not a perfect parent, but notes that "perfection is not required of Nebraska's parents." Brief for appellant at 14. Indeed, Nebraska appellate courts have held that in proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. See *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). As the juvenile court noted in its termination order, we "[do] not doubt that Kali cares for her children greatly." However, the most significant issue in this case remains Kali's persistent struggle with her drug addiction.

The origins of this case reflect that Kali does not appreciate the risk of harm her addiction poses to her children. In January 2020, Kali transported her children in a vehicle to the office of her probation officer, where she tested positive for methamphetamines. In January and February, Kali twice violated a safety plan which required supervision for all contact between her and her children. The second violation of the safety plan occurred after Bougger had explained to Kali that the purpose of the safety plan was to keep Kali's children in her home and to ensure their safety while she was under the influence of drugs. At trial, she denied using methamphetamines in the home, despite being confronted with a report reflecting that Amara's hair tested positive for environmental exposure to methamphetamines.

After her children were removed from her home, Kali initially refused treatment services, insisting that she would be able to achieve sobriety on her own. Once Kali was participating in treatment, she struggled to maintain her progress. She did not successfully complete treatment until her third attempt. She was asked to leave a transitional housing program after only a few weeks because she could not comply with the house rules. She then refused to follow her outpatient aftercare recommendations and her treatment bond was revoked. At the time of trial, Amara and Carter had been out of Kali's home for 20 months and Kali estimated her longest period of sobriety during that time was 4 months. During 2021, Kali missed fifty drug tests. Kali was also on a waiting list to restart an intensive outpatient program.

We are additionally concerned that Kali never progressed to having unsupervised parenting time with Amara and Carter. While testimony from the visitation worker and her manager described Kali's visits as positive and her attendance as generally consistent, her parenting time hours were reduced during the case from 4 hours a week to 2. Although no specific reason was provided as to why Kali's visits were reduced and remained supervised, we presume that the interruption to in-person visits caused by Kali's treatment and incarceration was a contributing factor.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Kali's ability to maintain sobriety over the course of the case. At the time of trial, she had just recently been released from jail and was planning a fourth attempt at treatment. Given Kali's history and circumstances at the time of trial, it appears that Kali is unlikely to achieve and sustain continued sobriety in the near future.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Amara and Carter have been in foster care since February 2020. While we acknowledge the challenges of overcoming addiction, the children deserve stability in their lives and should not be suspended in foster care when Kali is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Kali was unfit and that terminating her parental rights was in the children's best interests.

CONCLUSION

We conclude the GAL and State proved by clear and convincing evidence that grounds for termination of Kali's parental rights existed under § 43-292(7) and that termination of her parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.