IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF RAYVEN M. & KALEB M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RAYVEN M. AND KALEB M., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MEGAN M., APPELLANT.

Filed September 12, 2023.    Nos. A-22-741, A-22-747.

IN RE INTEREST OF RAYVEN M. AND KALEB M., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BLAKE M., APPELLANT.

Filed September 12, 2023.    Nos. A-22-752, A-22-753.

Appeals from the County Court for Phelps County: TIMOTHY E. HOEFT, Judge. Affirmed.

John A. Sauder, of DeWald Deaver L'Heureux, P.C., L.L.O., for appellant Megan M.

Jeffrey P. Ensz, of Lieske, Lieske, & Ensz, P.C., L.L.O., for appellant Blake M.

Natalie Nelsen-Pacey, Phelps County Attorney, and Jonathan Brandt for appellee.

BISHOP, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

- 1 -

INTRODUCTION

Megan M. and Blake M. appeal from the order of the county court for Phelps County, sitting as the juvenile court, terminating their parental rights to their son Kaleb M. (born in 2016) and their daughter Rayven M. (born in 2020). Upon our review of the record, we affirm.

BACKGROUND

Megan and Blake are the parents of Kaleb and Rayven. They were never married. The Department of Health and Human Services (DHHS) first opened an inquiry into this case in December 2018 after a call was received through a hotline alleging Megan had drugs around Kaleb. After a search warrant was issued, law enforcement found drug paraphernalia in Megan's residence, including within Kaleb's room. At the time, Megan and Blake were not residing together. Kaleb was removed from the home on December 31, 2018, and a juvenile petition was filed. Subsequently, Megan and Blake reconciled and began living together. After the parties had demonstrated progress with respect to their substance abuse and ability to provide a safe home, Kaleb was returned to the care of Megan and Blake on February 29, 2020. However, he was removed again two days later on March 2, following a domestic violence incident in which law enforcement was called. The incident involved a disagreement between Megan and Blake which culminated in Megan beating the back of Blake's head with her phone.

Rayven was born shortly thereafter in April 2020. No juvenile case was filed with respect to Rayven for over a year. However, ongoing monitoring of her condition did exist as a result of Kaleb's case remaining open. Rayven lived with Megan initially following her birth, but at some point, Blake became her primary custodian. No formal court orders regarding her custody were entered until July 2, 2021. On that day, Rayven was removed from Megan and Blake's care due to another domestic violence incident that took place in Rayven's presence. During the incident, Megan removed Rayven from Blake's car. Blake then pursued Megan, pulled her hair, and slapped her in the face. In September 2021, the State filed motions to terminate the parental rights of Megan and Blake with regard to both Kaleb and Rayven. The motions alleged that termination was in the best interests of the children. The motions also specified the presence of multiple statutory factors which justified termination pursuant to Neb. Rev. Stat. § 43-292 (Cum. Supp. 2022):

| Appellate Case Number | Parties | Statutory Sections Alleged |
|---|---|---|
| A-22-741 | Megan – Rayven | • § 43-292(2)<br>• § 43-292(4)<br>• § 43-292(5) |
| A-22-747 | Megan – Kaleb | • § 43-292(2)<br>• § 43-292(3)<br>• § 43-292(4)<br>• § 43-292(5)<br>• § 43-292(6)<br>• § 43-292(7) |

| A-22-752 | Blake – Kaleb | • § 43-292(2) |
| | | • § 43-292(6) |
| | | • § 43-292(7) |
| A-22-753 | Blake – Rayven | • § 43-292(2) |

Trial on the motions to terminate parental rights was held on April 26 and 27, 2022. Megan, Blake, various DHHS caseworkers and visitation supervisors, therapists, and a licensed psychologist who conducted psychological evaluations on Megan and Blake testified at trial. The main issues addressed during the hearing were the volatile nature of Megan and Blake's relationship and the use of illegal narcotics by each parent as well as their mental health diagnoses. Also addressed was the impact these issues had on the children.

An initial DHHS created case plan was adopted by the court on March 13, 2019, which set out goals for Megan and Blake. The original goals for the case plan have remained the same throughout the lifespan of the case though additional goals were added following Megan and Blake's psychological evaluations. The basic goals in the case plan were that (1) Megan and Blake will appropriately provide for the basic needs of Kaleb in a safe environment, (2) Megan will refrain from the use of illegal substances and focus on her mental health needs to appropriately care for Kaleb, and (3) Blake will refrain from the use of illegal substances to appropriately care for Kaleb. Upon the removal of Rayven, the same goals were adopted for her cases as well. A number of services were arranged to assist Megan and Blake to achieve these goals.

Megan and Blake's psychological evaluations were conducted by Dr. Gage Stermensky. Megan first met with Stermensky in May 2020. Stermensky diagnosed Megan with unspecified personality disorder with dependent, borderline, and antisocial personality traits; unspecified depressive disorder; cannabis use disorder (severe); and methamphetamine use disorder (severe). Following this first assessment, Stermensky testified that he had a "multitude of concerns" for Megan including her history of relationships based on substance use, her normalization of domestic violence, and her ability to maintain housing and protect her children. Stermensky concluded the evaluation by recommending that Megan engage in individual counseling to explore the trauma she has experienced as well as to achieve abstinence from substances, train in anger management social skills, and to ensure she has financial, housing, and transportation abilities to meet her children's needs.

In February 2021, Stermensky completed another evaluation of Megan. At that point in time, Megan was reported to be 12 months sober. Stermensky testified that he observed Megan to have tried to participate in some of the treatment programs that he had recommended, but he did not see a lot of improvement. He also found that the results of Megan's testing came back the same as they were in 2020 or worse. Stermensky was guarded regarding Megan's continued sobriety and progress.

Blake also completed psychological evaluations with Stermensky in May 2020 and February 2021. Blake was diagnosed with unspecified bipolar and related disorder, antisocial personality traits, cannabis use disorder (severe), and amphetamine use disorder (severe). Stermensky testified that the most important issues for Blake to address were his history of substance abuse and domestic violence. It was recommended that Blake engage in a 12-step

sobriety program with sponsorship, attend individual therapy, attend a men's domestic violence course, and participate in family or couple's counseling to address these issues.

In February 2021, Stermensky completed another evaluation for Blake. Stermensky noted that there had been some progress since the last evaluation but he still had concerns regarding Blake's long-term prognosis. Stermensky testified that he would need to see Megan and Blake maintain at least 12 months of sobriety and progression before reunification could be considered.

Stermensky's recommendations for Megan and Blake were added to their goals for their respective case plans. Overall, DHHS and the court wanted to see Megan and Blake address three key areas: substance abuse, mental health, and relationship dynamics. To help in these areas, DHHS provided resources for each of the parents including access to domestic violence courses, support groups, treatment programs, and therapists.

At the termination hearing, Megan testified that she broke two years of sobriety in March 2018 and continued to use methamphetamine until December 2018 when Kaleb was removed from her home. She then was able to maintain sobriety from January 2019 to April 2021 during which time she was pregnant with Rayven. However, Megan also admitted that for a time in 2021, she was tampering with her drug tests by diluting the urine analyses and lying to the caseworkers. Her case manager, Alex Trevino, testified that Megan also tampered with sweat patches that were placed on her to detect drug use. In March a bag containing methamphetamine and a pipe were found in her coat pocket, but Megan maintained she was not using at that time. She admitted that she began using in April. At about the time that the petition to terminate parental rights was filed, September 2021, she was placed on a wait list for inpatient co-occurring disorder treatment at a facility. In November 2021, Megan entered in-patient treatment at Seekers of Serenity and was successfully discharged in December. She has maintained sobriety since her discharge.

Megan also admitted at trial that a long history of domestic violence existed between her and Blake. Since Kaleb was born, they have had an on again–off again relationship. Megan and Blake lived together in 2020 when Kaleb was briefly returned to their care. They attempted couples counseling in 2020, but only attended a few sessions before quitting. When Megan completed treatment, she attempted to contact Blake. The caseworker had concerns about those communications because Megan was trying to entice Blake into a relationship. At the time of the termination trial, Megan and Blake had separate visitations, lived in different towns, and had no contact with each other.

Megan began participating in a domestic violence support group in March 2022. Prior to that, Megan attended individual therapy. Per the recommendations of her prior therapist, Megan began seeing Faithe Kroll in September 2020 to participate in Eye Movement Desensitization and Reprocessing (EMDR), a special process used to process past traumas. Kroll testified that Megan has completed all of her EMDR work but continues seeing Kroll for individualized therapy. In addition to individual therapy, Megan regularly attended child-parent psychotherapy sessions with Kaleb conducted by Briana Woodside. Woodside described Megan's progression as "variable" and stated that she would need to see consistency and longevity in Megan's use of the tools she has been taught in the therapeutic setting. While she noted that Megan had made progress since completing treatment, in Woodside's opinion, Megan was not in a position to reunite with her children because she has been unable to show the longevity and consistency required.

Blake's case plan goals also required him to address his history of substance abuse, domestic violence, and mental health issues. In 2018 when Kaleb was removed, Blake was on probation in an unrelated case. Blake received regular drug tests through probation which he testified came back negative. Upon completion of his probation, DHHS began drug testing Blake following a team meeting where he was observed to slur his speech and behave in an erratic manner. Drug testing conducted by DHHS regularly came back positive for hydrocodone, hydromorphone, and THC. Blake testified that he was prescribed hydrocodone from a general practice doctor he sees in Burwell, Nebraska. The evidence established that Blake lived in Kearney, 86 miles away from Burwell. Blake also testified that he legally purchases and uses Delta-8, for pain management. He buys Delta-8 from local CBD stores. However, a caseworker with DHHS who supervised Blake's case testified that the positive drug tests were concerning because the results showed varied amounts of hydrocodone and THC that were not consistent with the amount that would be present with prescription medication. Blake refused to participate in a 12-step recovery group. He testified that he had completed that requirement as part of his probation, and no longer needed to attend. He admitted it had been a few years since he had attended a recovery group meeting.

Since ending his relationship with Megan, Blake has been in a relationship with Randie White. At the time of trial, Blake testified that he and White were engaged. Blake and White also have a history of domestic violence. In one incident described by Blake at trial, White broke a car window and hit Megan while Rayven was in the car. Blake attributed other instances of domestic violence between him and White to his drug use.

Blake first attended a domestic violence program from November 24, 2020, to April 12, 2021, but did not complete the course. Blake re-enrolled on November 10, 2021, and was approximately halfway through the program at the time of the termination trial. The facilitator of the program described Blake's attendance as adequate on average and stated that his engagement with the class varied from "demonstrat[ing] remarkable insight and provid[ing] his peers with incisive reflection and response to their sharing" to "disinterested and distracted." Blake has refused to participate in couples counseling with Megan and testified that he maintains zero communication with her.

Blake did not start individual therapy until January 18, 2022. Samantha Keim, a DHHS supervisor, completed a reunification assessment in February 2022 and determined that it was still unsafe for Kaleb and Rayven to return to Megan and Blake's care. The greatest concern for Blake was that Blake had not acknowledged his part in the children being removed and blamed others instead. Blake attended some child-parent psychotherapy with Kaleb and Woodside. Woodside wrote a letter in 2021 requesting that Blake's supervised visits be suspended and that his only contact with Kaleb occur in a therapeutic setting. This was due in part to a few incidents where Blake perceived Kaleb to be hurt and rushed him to the hospital in anger. Woodside testified that such heightened reactivity and aggression was a concern for Kaleb's well-being. Similar to Megan, the caseworkers testified that DHHS would need to see consistency and longevity in Blake's progress before reunification would be plausible.

When Kaleb was removed in December 2018, he was placed with Megan's sister, who has served as the foster placement for both children throughout the pendency of the case. Shortly thereafter, Megan and Blake rekindled their relationship and moved in together. In February 2020,

Kaleb was returned to the care of both of them, but was removed two days later due to a domestic violence incident. Kaleb was again placed with his previous foster parent. When Megan and Blake ended their relationship, Blake moved to Kearney and Megan moved to Holdrege. Since Kaleb's subsequent removal in 2020, Megan has only had supervised or semi-supervised visits with Kaleb. The semi-supervised visits ended in April 2021 when Megan resumed using methamphetamine and THC. At the time of the termination hearing, Blake was only allowed therapeutic visits with Kaleb. Rayven was born in April 2020 and removed in April 2021. Both Megan and Blake were allowed fully supervised visitations with Rayven at the time of the termination hearing. Each parent had separate visitation time with each of the children.

While both parents held jobs at the time of trial, both experienced difficulty maintaining work and had worked for several employers since Kaleb's original removal. Neither parent wished to reconcile their relationship, but both acknowledged that they had made little progress toward finding methods to co-parent their children. Megan was on a medication management program regarding her mental health. Although recommended, Blake had not yet become engaged in medication management related to his mental health.

Woodside, Kaleb's therapist, testified that the constant transitions between Megan's home, Blake's home, and the foster home have been difficult for Kaleb. Woodside did not treat Rayven because she was too young to participate in counseling. Woodside testified that at intake Kaleb was diagnosed with "other specified trauma and stressor-related disorder" based on reports that Kaleb had witnessed parental conflict, experienced neglect, demonstrated aggression, and overall faced dysregulation. Woodside described Kaleb's treatment goals as follows:

> [T]hat he would develop and be supported; utilize the emotional regulation skills by a decrease in aggression; caregivers and client will develop earned secure attachment through caregiver's daily use of therapeutic parenting; caregivers will support client to develop flexible and adaptive thinking by age-appropriate boundaries and use of emotional responsiveness; and then there was one specific goal related to caregivers demonstrating the ability to maintain safe boundaries with one another and with other adults.

Woodside testified that Kaleb was entering a critical time developmentally. He was now five years old and had spent most of his life outside of his parents' homes. Because of the uncertainty surrounding his placement and the frequent transitions, he was having a difficult time developing a secure attachment to any caregiver. She stated that Blake had not been able to make any prolonged progress toward gaining a secure attachment with Kaleb. Since Megan was more consistent in attendance at child-parent psychotherapy sessions since completing inpatient treatment, her engagement with Kaleb had improved. However, Woodside opined that neither Megan nor Blake had shown the consistency and longevity in effort as of the time of trial wherein she could recommend reunification. While she acknowledged recent progress, she stated that the long period of uncertainty had put Kaleb in a position that if permanency was not given to him quickly, long term negative effects would be seen in his brain development. She testified that the heightened state of stress he was living in could become a permanent trait if a safe attachment to a trusted caregiver could not soon be accomplished. Given Megan and Blake's track record of inconsistency, she did not believe that Kaleb should be required to wait any further for the

establishment of such a relationship. She concluded that Kaleb needed permanency sooner rather than later in order to have positive development.

The DHHS caseworkers testified that after visitations with Megan and Blake both Kaleb and Rayven had a tendency to go through behavioral changes such as not listening, having trouble regulating emotions, and showing aggression. Trevino, who supervised the case for DHHS for the majority of its pendency, opined that giving the parents more time to achieve their case plan goals was not in the best interests of the children because they have had three and a half years to do it and have only made progress in the last few months prior to the termination hearing.

In a written order dated September 12, 2022, the court terminated Megan and Blake's parental rights to both Kaleb and Rayven. The court noted that while Megan and Blake have made some progress on their court plan goals, most of that progress had come only in the months following the State's filing its motions for termination of parental rights. After reviewing the evidence presented at trial, the court found that Megan and Blake had failed to demonstrate significant sustainable changes which would show that they could safely parent their children. The court found that the State had met its burden of proof as to the statutory grounds alleged in each of the four petitions and that termination was in Kaleb and Rayven's best interests.

Megan and Blake have each appealed.

## ASSIGNMENTS OF ERROR

Consolidated and restated, Megan and Blake each assert that the juvenile court erred in finding that there were statutory grounds for the termination of their parental rights to Kaleb and Rayven and that termination was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interest. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. *In re Interest of Mateo L. et al., supra*. Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

*Statutory Grounds.*

The State alleged separate and distinct statutory grounds for termination between each parent and each child. The court found that the State had proven statutory grounds to terminate Megan's parental rights to both Kaleb and Rayven under § 43-292(2) and (4). The court also found statutory grounds for termination of Megan's parental rights to Kaleb pursuant to subsections (3),

(6), and (7). The court further found that statutory grounds existed to terminate Blake's parental rights to Kaleb under § 43-292(2), (6), and (7), and his parental rights to Rayven pursuant to subsection (2). Since all of the petitions alleged § 43-292(2) as a basis for termination and the court found that provision to have been satisfied as to both children and both parents, we analyze that provision. Upon our review of the record, we find that the State proved by clear and convincing evidence that termination of the rights of both parents to both children was warranted pursuant to § 43-292(2). Therefore, we need not consider the other statutory grounds alleged. See *In re Interest of Mateo L. et al., supra.*

Section 43-292(2) states that termination of parental rights is proper when "the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al., supra.* We recognize that one need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Prior neglect of a sibling may be grounds for termination of parental rights if such termination is also in the children's best interest. See *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

Megan and Blake have failed to provide an environment for which their children can return. Kaleb had been out of the home for 40 months at the time of trial. Although he was briefly returned to the parties' home for a few days in 2020, the parties' engagement in domestic violence in his presence resulted in his quick removal. The case plan goals remained generally the same since January 2019 asking Megan and Blake to address their mental health, substance abuse, and domestic violence issues. The evidence in this case shows that while periods of progress occurred, no sustained improvement was attained. The most significant progress came after the State filed the motion to terminate their parental rights 33 months following Kaleb's initial removal.

According to Megan, she was able to maintain a year of sobriety throughout 2020 and some of 2021 without the assistance of treatment. She testified at trial that she relapsed in April 2021. However, she also admitted to tampering with drug tests and lying to DHHS officials about drug paraphernalia found on her person prior to that April 2021 date. She was in the midst of her relapse when the State filed their motion for termination of parental rights in September 2021. It was at that point that she sought inpatient treatment and thereafter was admitted.

Megan did make progress in addressing her mental health through individual therapy. She successfully completed her EMDR and continued to see her therapist regularly. Megan also participated in child-parent psychotherapy with Kaleb. However, Megan did not always apply the skills learned in her therapy. A reunification assessment completed in February 2022 determined that it was unsafe for the children to return to Megan due to her behaviors. Additionally, given her track record of periods of sobriety and stability followed by relapse, her DHHS case manager believed that a long term period of stability by Megan was needed before the court could consider returning the children to her care.

Similarly, Blake showed limited progress until the State filed its motion to terminate his parental rights. Blake refused to participate in any sort of substance abuse program claiming that he completed such group work through probation. However, he admitted at trial that it had been a few years since he attended any sort of support group meeting. Blake also regularly tested positive for hydrocodone and THC. While the hydrocodone was prescribed and the Delta-8 was legally obtained, Stermensky as well as the caseworkers and therapists who attempted to work with Blake questioned whether it was a healthy choice for him. Although Blake stated willingness to see more specialized medical professionals in Kearney to address management of his prescriptions, he never took steps to actually do so. More significantly, Blake regressed in his interactions with Kaleb, causing Kaleb's therapist to recommend cutting Blake's contact with Kaleb to therapeutic visits only. As observed by Stermensky, Blake's ability to develop insight into his shortcomings and tendency to blame others for problems proved to be a huge barrier to improvement. He was consistently required to enroll in domestic violence programming. He discontinued attendance at one program and only enrolled in the second program after the motion to terminate parental rights was filed. Given Blake's long history of engaging in domestic violence with multiple partners, his lack of insight and postponement of taking positive steps to address this issue are telling.

Due to the history of the relationship between Megan and Blake, the two had zero communication at the time of trial. It was recommended that they engage in couples counseling, but that was not completed due to the deterioration of their relationship. Blake is currently engaged to White. Upon her release from treatment, Megan contacted Blake in an attempt to rekindle their relationship. While it is likely best for Megan and Blake to remain apart, neither of them has taken any steps toward repairing their relationship even minimally so as to allow them to co-parent their children and treat each other in a civil manner.

Several of the DHHS caseworkers testified that neither Megan nor Blake is in a position to reunify with their children. While the progress they made in the months following the filing of the motion for termination of parental rights is commendable, it is too little too late. It has long been held that "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Mateo L. et al.*, 309 Neb. 565, 581, 961 N.W.2d 516, 528 (2021). Over the course of 40 months, Megan and Blake failed to put themselves in a position for their children to return to their care. As such, they have demonstrated substantial, continual, and repeated neglect. Therefore, the court did not err in finding that termination was proper pursuant to § 43-292(2). Having found that the State has met its burden of proof on this statutory factor, we need not analyze any further statutory bases for termination. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

*Best Interests.*

In addition to establishing statutory grounds for termination, the State must also show by clear and convincing evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id.* Since the parent's right to raise their child is constitutionally protected, there is a rebuttable presumption that the best interests of the child is to have a relationship with their parent. *Id.* The State can overcome this presumption by showing that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or capacity

that has, or will, prevent the performance of a reasonable parental obligation, and caused, or will cause, a detriment to the child's well-being. *Id.*

Most of the evidence presented at trial pertained to Kaleb due to Rayven's young age. Kaleb's experience is relevant to inform Rayven's best interests as well. Kaleb has spent two-thirds of his life in foster care and Rayven has spent a sizeable percentage of her life outside of either of her parent's homes at the time of trial. Kaleb has seen a therapist, Woodside, who testified at trial. Woodside informed the court that Kaleb struggles with the constant transitions between the foster home, Megan's visitations, and Blake's visitations. She further described behaviors exhibited by Kaleb following periods of upheaval such as aggression and inability to regulate his emotions. A DHHS caseworker also described negative behaviors from Rayven following her time with Megan and Blake including crying and physical aggression. Woodside held sessions with Kaleb and each of his parents. She described each of the parents' progression as "variable" because they were unable to provide consistency for Kaleb. Woodside stated that Kaleb needed longevity and consistency from his parents that they have been unable to provide.

Woodside opined that permanency for Kaleb had become critical. She testified that further delay in establishing a permanent caregiver for Kaleb would likely result in permanent damage to his brain function and ability to make a secure attachment. Kaleb needs permanency now and should not be made to wait further to see if his parents can attain the level of maturity to allow them to be safe and effective parents. Rayven also deserves stability from her parents. While there was no testimony that she has reached the critical point now occupied by Kaleb, the court was not required to allow her to reach that point before providing her permanency. Her parents' past record as to Kaleb informs our inquiry regarding her best interests.

Megan and Blake have failed to put themselves in a position to provide the stability and consistency for their children. Both children have spent a large portion of their young lives in out-of-home placement. At the time of the termination hearing, neither parent was in a position to reunify with their children and would require an extended period of stability and progress before reunification would even be plausible. Kaleb and Rayven should not be required to wait further in the hopes that their parents will mature. Therefore, termination of the parental rights of Megan and Blake is in their best interests.

## CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating the parental rights of Megan and Blake to their children Kaleb and Rayven.

AFFIRMED.