IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ROSA T. & HUNTER T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ROSA T. AND HUNTER T., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TIMOTHY T., APPELLANT.

Filed January 23, 2024.   No. A-23-467.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Justin D. Eichmann, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

Cara Stirts, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Timothy T. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his two children, Rosa T. and Hunter T. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Timothy is the biological father of Rosa, born in 2020, and Hunter, born in 2021. Gina B., also known as Gina L., is the children's mother. The State sought to terminate Gina's parental rights to Rosa and Hunter during these same juvenile proceedings below. Gina's parental rights to Rosa were terminated in November 2021, and she ultimately relinquished her parental rights to

- 1 -

Hunter in February 2023. Because Gina is not part of this appeal, she will only be discussed as necessary.

It is important to note that Gina has four other biological children, and Timothy is the father of three of those children. Those four children were removed from Gina's care in October 2018 due to concerns of child abuse. A petition and supplemental petitions (under this same juvenile court docket number) were filed alleging those four children were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). All four children were adjudicated in January 2019. Gina relinquished her parental rights to the four children on May 28 or 29, 2020. On May 29, the State filed a motion to terminate Timothy's parental rights to his three children, and he ultimately relinquished his parental rights to those children in August or September.

Less than 2 weeks after Gina relinquished her parental rights to her four older children, Rosa was born. Rosa was removed from Gina's care the next day, while she was still in the hospital. On June 11, 2020, the State filed a third supplemental petition alleging that Rosa was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of Gina. That same day, the juvenile court entered an ex parte order placing Rosa in the immediate temporary custody of the Nebraska Department of Health and Human Services (DHHS). Rosa has remained in foster care ever since. In September, Rosa was adjudicated as a child within the meaning of § 43-247(3)(a) based on admissions by Gina. Gina's parental rights to Rosa were subsequently terminated in November 2021.

When Rosa was born, Gina reported that Rosa's father could be either Timothy or his brother, William T.; however, William was listed as the father on Rosa's birth certificate. On June 16, 2020, the State filed a fourth supplemental petition alleging that Rosa was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of William.

In an order filed on January 19, 2021, the juvenile court stated that it had "received written correspondence from [Timothy] regarding a request for DNA testing in this matter as it relates to Rosa." The court appointed counsel to represent Timothy for purposes of pursuing a "potential Complaint to Intervene as it relates to Rosa." On February 9, Timothy filed a "Verified Complaint-in-Intervention," alleging that he had reason to believe that he was the biological father of Rosa and requesting an order requiring genetic testing; if Timothy was confirmed as the father, then he "has a direct an immediate legal interest in this matter and the requested intervention is in the Child's best interest." On April 15, the court entered an order for the genetic testing of Timothy and Rosa.

Hunter was born in the summer of 2021, and was removed from Gina's care the day after his birth before he was released from the hospital. On June 23, the State filed a fifth supplemental petition alleging that Hunter was a child within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the fault or habits of Gina. That same day, the juvenile court entered an ex parte order placing Hunter in the immediate temporary custody of DHHS. Hunter has remained in foster care ever since. In September, Hunter was adjudicated as a child within the meaning of § 43-247(3)(a) based on admissions by Gina.

On June 29, 2021, the State filed a sixth supplemental petition alleging that Hunter was a child within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the fault or habits of Timothy in that:

A. Said juvenile was removed from the care and custody of his mother, Gina . . . on or about June 23, 2021.

B. Timothy . . . is currently living with Gina . . . and does not plan to leave.

C. Timothy . . . has failed to place himself in a position to parent said juvenile.

D. Timothy . . . is unable to provide proper parental care, support, and/or supervision for said juvenile.

E. Due to the above allegations, said juvenile is at risk for harm.

In an order entered on July 14, Hunter was adjudicated to be within the meaning of § 43-247(3)(a) based on Timothy's admissions to the allegations in parts A, B, and E of the sixth supplemental petition set forth above; parts C and D were dismissed on the State's oral motion. The matter proceeded to partial disposition and Timothy was ordered to undergo an updated psychological evaluation and parenting assessment, cooperate with Family Support Worker services, and have reasonable rights of agency-supervised visitation.

In a separate order entered on July 14, 2021, the juvenile court found that genetic testing had been completed and Timothy was the biological father of Rosa; Timothy was allowed to intervene in the proceedings as they related to Rosa.

Following a continued disposition and permanency planning hearing regarding Hunter in September 2021, Timothy was also ordered to maintain a stable and legal source of income; obtain and maintain safe, appropriate, and adequate housing; participate in and successfully complete a parenting class; and attend all medical appointments for Hunter. Following a hearing in January 2022, Timothy was also ordered to participate in and successfully complete outpatient therapy and to participate in medication management. Following a hearing on April 7, Timothy was additionally ordered to complete a hair follicle test by April 11, and participate in couple's counseling.

On April 15, 2022, the State filed a seventh supplemental petition alleging that Rosa was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of Timothy in that:

A. Timothy . . . currently has an open case under [this same juvenile court docket number] in which his other minor child was removed and remains out of his care and custody.

B. [Gina's] parental rights to said juvenile were terminated, on or about November 16, 2021.

C. Timothy . . . is currently living with Gina . . . and does not plan to leave.

D. Timothy . . . has failed to place himself in a position to parent said juvenile.

E. Timothy . . . is unable to provide proper parental care, support, and/or supervision for said juvenile.

F. Due to the above allegations, said juvenile is at risk for harm.

In an order entered on May 10, the juvenile court adjudicated Rosa to be within the meaning of § 43-247(3)(a) based on Timothy's admissions to the allegations in parts A, B, and F of the seventh supplemental petition set forth above; parts C, D, and E were dismissed on the State's oral motion. The matter proceeded to disposition and Timothy was ordered to participate in and successfully

complete outpatient therapy; participate in medication management; cooperate with Family Support Worker services; maintain a stable and legal source of income; obtain and maintain safe, appropriate, and adequate housing; participate in and successfully complete a parenting class; attend all medical appointments for Rosa and Hunter; participate in couple's counseling; and have reasonable rights of agency-supervised visitation. On June 7, the court vacated the order for couple's counseling because Timothy and Gina were no longer together.

On August 24, 2022, the State filed a motion to terminate Timothy's parental rights to Rosa and Hunter pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Timothy had substantially and continuously or repeatedly neglected and refused to give the children, or a sibling of the children, necessary parental care and protection; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); Rosa and Hunter had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Timothy's parental rights was in the children's best interests.

TERMINATION HEARING

The parental rights termination hearing was held on February 1 and 2, and April 10 and 19, 2023. The State called several witnesses to testify, and numerous exhibits were received into evidence. Timothy did not testify in his own behalf, nor did he call any witnesses to testify on his behalf.

Cheyenne Wilson was the DHHS case manager assigned to this family from the spring of 2020 (prior to Rosa's and Hunter's births) until October 2021, and she then became the case supervisor and remained as such until December 2022. When the case was first assigned to Wilson, she staffed the case with the previous caseworker and their supervisor. Wilson also reviewed the case file which included prior intakes, court reports, court orders, documentation from service providers, medical information, and documentation of contacts with the children, parents, and foster parents.

Wilson stated that this case had been open since 2018. Gina's four older children were removed due to physical abuse and were adjudicated. Timothy was the father of three of those children and received services regarding those children in this same juvenile docket; Wilson confirmed that many of those services were the same services provided in the current case. The State filed a motion to terminate Timothy's parental rights to the three older children in May 2020, and he ultimately relinquished his parental rights a few months later.

Wilson testified that Rosa was removed from her mother right after her birth in 2020, and Hunter was removed around the time of his birth in 2021. As it relates to Timothy, Rosa's and Hunter's removals were due to concerns with Timothy's lack of progress in the previous case involving his three older children and Timothy's continued relationship with Gina. During Wilson's time on the current case, she kept in regular contact with Timothy.

According to Wilson, Timothy was court ordered to complete a psychological evaluation and parenting assessment. Theodore J. DeLaet, a psychologist, conducted a psychological evaluation and parenting assessment of Timothy in 2019, and then again in 2021. In 2019, Timothy was involved in juvenile proceedings related to his three older children; Rosa and Hunter had not yet been born. DeLaet diagnosed Timothy with cannabis use disorder (reportedly in full sustained

remission) and a personality disorder as the two major clinical diagnoses; two other descriptive diagnoses were relationship problems and separations in the family. Characteristics that DeLaet observed were "a narcissistic or sort of a selfish point of view[;] antisocial, which is problems with rules, authority, and structure; avoidant, independent traits, which is sort of what they mean, tries to avoid things; and also has a tendency to develop dependencies in relationships." DeLaet believed that the personality disorder affected Timothy's ability to parent. Based on his risk profile, Timothy was at a moderate to high risk of engaging in future child maltreatment. In 2019, Timothy demonstrated "[l]imited" insight into how his actions were affecting his children. In his report, DeLaet recommended "significant caution in proceeding with [Timothy] becoming the legal guardian for the children" as "[h]is prognosis for successful reunification of the children and functioning as a single parent for them without social service assistance or oversight is poor." DeLaet also had "significant concerns about [Timothy's] understanding and appreciation of the medical, mental health, and educational needs of each of the children."

By the time of the 2021 reevaluation and reassessment, Timothy had relinquished his parental rights to his three older children, but Rosa and Hunter had been born. DeLaet continued to diagnose Timothy with cannabis use disorder, sustained remission. However, DeLaet modified the personality disorder diagnosis because there was "paranoid and persecutory thinking"; this "contributed to a diagnosis for a schizotypal type of personality disorder." DeLaet continued to believe that the personality disorder affected Timothy's ability to parent. From the records that he reviewed, DeLaet had not seen any significant progress between the 2019 and 2021 evaluations. Based on his risk profile, Timothy remained at a moderate to high risk of engaging in future child maltreatment; although some of the individual factors had changed since 2019, the "net risk rating stayed the same." DeLaet did not see any evidence of significant improvement since 2019 regarding Timothy's insight into how his actions might be affecting his children. In his report, DeLaet recommended proceeding with "high caution" toward reuniting Timothy with his children, psychiatric medication management for Timothy's delusional thinking, and couple's therapy for Timothy and Gina.

DeLaet last saw Timothy on October 6, 2021. When asked if his previous findings would still be accurate, DeLaet replied that "[t]here's a little complexity" to the question. DeLaet stated that the diagnoses for cannabis and personality issues, "would generally be thought to be ongoing, and so the question is how well or poorly managed are they." However, "there are other things that could change over time, such as [Timothy's] understanding of child development."

Wilson stated that in addition to the psychological evaluation and parenting assessment, Timothy was ordered to work with family support, maintain housing, have a legal source of income, and participate in supervised visitation. At one point he was also ordered to participate in individual therapy, medication management, and couple's therapy with Gina. According to Wilson, Timothy completed parenting classes and he was successfully discharged from family support, even though he was still working on budgeting, maintaining his housing, and working on parenting skills. It was Wilson's understanding that Timothy was attending medication management appointments, but "the majority of the case he was not compliant with taking the medication that had been prescribed." He reported to Wilson that "he was not going to take the medication because they were not needed," "he didn't agree with the diagnoses that he had been

given," and then he "ultimately stated that he was taking the medication after the termination of parental rights had been filed [in August 2022] so that the State couldn't hold it against him."

Timothy participated in supervised visitation with Rosa and Hunter 3 days each week from 10 a.m. to 1 p.m. According to both children's foster mothers, Timothy was not consistent with visitation. Rosa's foster mother stated, "We tend to go one or two weeks where he's pretty consistent, and then we kind of fall off for a couple of weeks"; "[i]t's kind of a cycle where he gets sick or something like that happens." Hunter's foster mother stated there were also days that Timothy would not confirm the visit so no visit would take place. Wilson stated that Timothy canceled numerous visits because he did not feel well. He also reported having COVID, but when asked for proof he never provided any proof. Wilson was concerned about Timothy's honesty regarding his ability to attend visits.

According to Wilson, Timothy said that it was hard to manage both children at the same time, and that it was much easier if one of the children was napping and he could focus on the other child. When asked if Timothy ever demonstrated that he could manage both children on his own even for short periods of time, Wilson responded, "No," "[n]ot on his own." There were generally no safety concerns with visits, but there were still concerns about Timothy's parenting skills and whether he was being honest about his relationship with the children's mother. There was a time when Timothy stated that he should not have to potty train during his visits because it took away from his visitation time. That concerned Wilson because Timothy had two very young children and potty training was a typical parenting responsibility. Additionally, Rosa's foster mother stated that Timothy thought Rosa should tell him when she needed to go to the bathroom, which the foster mother said "is an awesome skill to be working on but it's not something that [Rosa] fully comprehends yet."

Both Rosa and Hunter have special medical needs. Rosa's foster mother testified that Rosa has aortic stenosis, meaning that "her aortic valve was malformed and blood was not flowing as it should be." The foster mother stated that Rosa has had "two heart caths," but "the second one was deemed unsuccessful, so we moved to an open heart surgery" where "they moved her pulmonary valve to the aortic side and put . . . a cadaver valve in the pulmonary side." However, "that valve, immediately after surgery, they knew was not functioning," so there is "free-flowing blood," and Rosa will require another surgery to replace that." Rosa "will have further [heart/valve] surgeries for the remainder of her life." The foster mother did not know when the next heart surgery would be. She said they were going to the cardiologist every 30 days to monitor the situation, but "were recently cleared for a year"; they will make an appointment sooner if needed. The goal is to push surgery out as long as possible because the bigger Rosa gets, "the more options that they have." Rosa also had two hernias from her open-heart surgery that would need to be repaired. There are times when Rosa's face and lips turn blue, so the oxygen levels in her blood need to be monitored; if her levels drop below a certain number then she has to go to urgent care to have it checked. According to the foster mother, Rosa has also had a febrile seizure, and because she has had one, she is more inclined to have them in the future, "[s]o that's something that needs to be monitored as well."

When asked if Timothy had ever attended Rosa's medical appointments, the foster mother said he had attended three out of five appointments. Timothy engaged with Rosa and asked questions, but in the foster mother's opinion, "sometimes those questions make [her] question his

understanding of things." For example, at Rosa's last heart appointment, Timothy asked if the next surgery would fix her heart; but Rosa has a lifetime illness and her heart will never be "fully fixed."

Hunter's foster mother testified that he was being followed by a neurologist; her understanding was that there was a history of seizures in the family and Hunter had also had night terrors, so they wanted to rule out seizure activity. Hunter was also seeing a dermatologist for his eczema. In the past, Hunter had "swallowing sessions" because he had a hard time swallowing anything beyond a puree or his bottles but was now doing well with eating. He also previously did physical therapy because he was "slower to learn to crawl and to walk and to do some of those things." Hunter was currently meeting his developmental milestones. According to the foster mother, Timothy attended some of Hunter's medical appointments, but she was concerned that after appointments he inaccurately reported what was said when they had family team meetings.

Wilson believed that Timothy had attended most of the medical appointments for the children. However, Timothy was late to several of Hunter's physical therapy appointments, causing Hunter to have a shortened appointment; that led to the recommendation that the foster parent be present at all the physical therapy appointments so that Hunter would get the full appointment. Hunter's neurologist also requested that the foster parent be present at all meetings because the neurologist was concerned that Timothy was not accurately reporting Hunter's medical history and needs. Additionally, during Wilson's conversations with Timothy, she was concerned that he did not understand what he had been told by the children's medical providers. For example, during a family team meeting in October or November 2022, Timothy was asked to give an update on Rosa's most recent medical appointment and prognosis. He reported that the appointment went very well; however, Rosa's foster mother did not have the same understanding. The foster mother indicated that Rosa's heart surgery was not a success and that she would need another heart surgery in the future, and Rosa would need to be monitored closely to see when that will be. As another example, Rosa was prescribed a medication for fluid that was around her lungs after her heart surgery; at a subsequent appointment Timothy commented that he thought the medication was for her vision. Wilson was concerned about Timothy's ability to care for the children's medical needs on his own.

Timothy was still in individual therapy when Wilson left DHHS in December 2022. Wilson recommended to Timothy that he make it a goal of therapy to discuss power and control behaviors and domestic violence, but Timothy "just continued to deny" any domestic violence other than one incident when he and Gina pushed each other. According to Wilson, Timothy's therapist stated that Timothy had not identified domestic violence as a goal for therapy, and that he would address it if Timothy was willing.

Wilson testified that Timothy was not able to verbalize or show an understanding of why the children had been removed, why he was involved, or why Gina was not safe or appropriate for the children. Timothy lived with Gina on-and-off during Wilson's time on the case. Gina's parental rights to Rosa were terminated in November 2021, but she still moved in with Timothy while he was trying to reunify with Rosa. Timothy was advised that he would have a difficult time reunifying with Rosa if Gina moved in with him, but he did not choose to live on his own to focus on Rosa; according to Wilson, Timothy and Gina even signed a lease together. However, Wilson stated that Timothy reported that Gina moved out in May 2022 to make it easier for him to reunify with the children, but they continued to have contact.

In addition to Gina, Timothy's brother, William, also lived with him for a while. In August 2021, Wilson received numerous reports that William was living in the home with Timothy and Gina. Timothy and Gina continuously denied that William was living there, but during one drop-in Wilson found William hiding under a blanket in the bedroom closet; Timothy stated that he did not know how William got there, and then later stated that it was Gina's idea to let William live with them for a least a couple of months to help William out. (According to a DHHS court report received into evidence, it was Gina who said that she did not know how William got there and then later said it was Timothy's idea to allow William to stay in the home.) Wilson was concerned not only with Timothy's dishonesty, but also because Timothy had reported that William was using methamphetamines, and Gina had reported concerns of domestic violence with William. Additionally, Wilson had worked with William in Rosa's case (he had signed the paternity acknowledgment and was listed as her father on the birth certificate), and Wilson had concerns about his compliance with court orders and his mental health needs.

Wilson was concerned about Timothy's ability to protect the children because he had not been able to verbalize or show an understanding of why Gina or William were not appropriate people to have around. Wilson said Timothy made statements that appeared as if he understood why William was not safe but then continued to allow William to be around. Timothy also made statements that he would allow Gina back once the case was over. According to Wilson, Gina's four older children were removed due to physical abuse and Gina later entered a plea to criminal child abuse charges; however, Timothy still disputed whether it was true and made comments that Gina was safe and would never harm the children.

Wilson was asked to describe Timothy's progress toward reunification during her time on the case. Wilson stated,

> Tim would participate in services. My overall concern with Tim was his understanding of why he was even participating in the services, his own mental health needs and how to care for those, the needs of the children, and the overall understanding of who he has around himself and the children and how they are safe or not safe for the children.

The conditions that required Rosa's and Hunter's removal were present throughout Wilson's time on the case. Wilson opined that it was in the children's best interests to terminate Timothy's parental rights.

Jessica Richard (later Jessica Jennings, but whom we still refer to as "Richard"), is a child and family services specialist with DHHS. Richard testified that she started working with this family and the previous caseworker in September 2022, and she had been assigned as the current caseworker since that December. Richard familiarized herself with the case by reviewing the case file, including previous court reports, court orders, evaluations, medical records, and contacts with the children, foster parents, and biological parents. Richard also discussed the case with the previous caseworker.

Richard had contact with Timothy monthly, meeting him face-to-face at his apartment and seeing him at team meetings. According to Richard, Timothy had completed an updated psychological evaluation and parenting assessment, participated in a parenting class, had safe and appropriate housing, and was successfully discharged from family support. He recently requested to reengage with family support to help him get caught up on his budget and to help him with

community resources (e.g., rental assistance, Medicaid, "SNAP"). Timothy attended two out of five family support meetings offered in March 2023 (Timothy had scheduling conflicts for two of the missed meetings, and the support worker could not reach Timothy for the other meeting). Timothy was also complying with medication management but had indicated to Richard that it was only because it was court ordered.

To Richard's knowledge, Timothy had not participated in any therapeutic services to address any of the concerns raised by DeLaet. Richard stated that when asked by a previous caseworker if he was working on the things in DeLaet's report, Timothy "got very defensive and reported that he didn't need to work on those things because they weren't true." There had also been concerns throughout this case about Timothy's relationship with Gina because she was "unsafe and inappropriate" and "has had her rights terminated and/or relinquished on all her children" and Timothy "stated to several case professionals that he would continue to let the children see her if reunification does occur." Richard stated that "at the moment," both Timothy and Gina "say that they are not together."

Richard testified that Timothy only had 9 hours of supervised visitation with his children each week and had not demonstrated that he could parent his children without assistance and supervision.

Teresa Drustrup, a visitation worker who supervised Timothy's visits with Rosa and Hunter since August 2022, testified that Timothy had visits scheduled 3 days each week, however "there's been a lot of absences." Since Drustrup's involvement, Timothy missed nine visits when he was sick and five because he either had a phone issue or he overslept (he either failed to call and confirm the visits in time, or he confirmed but then overslept). Whenever an issue arose, whether observed by Drustrup or raised by the foster parents, Drustrup would address it with Timothy. When asked if Timothy took redirection well, Drustrup replied, that he "would argue quite a bit or get upset quite a bit, but he generally took it to heart and worked on the area that needed work[ed] on."

Richard testified that during the months of the termination trial, Timothy attended six out of the seven visits offered to him in February 2023 (he cancelled one visit because he was ill, the other visits were cancelled due to weather or the trial). He attended all visits in March. Up to the last day of the trial in April, Timothy had missed three out of the seven visits he was offered that month; one he confirmed but then was a no show, one he failed to confirm, and on the last day of trial, he was a no show.

Richard believed that Timothy had made "fair progress" toward reunification. Her concern was that Timothy was "still at supervised visits due to the inconsistency and that he does not understand his own needs as well as his children's needs when it comes to mental health, medical needs, any of that sort, as well as being able to financially support them and care for them." Richard stated that Timothy "[f]or the most part" did attend the children's medical appointments but was not able to accurately report the information that was being discussed at the appointments. During April 2023, while the termination hearing was ongoing, Timothy missed a follow-up ENT appointment for Hunter because he forgot about it, and he missed a dental appointment for Rosa.

Richard stated that Timothy was participating in therapy but was unable to tell her what issues he was working on or what goals he was working towards but was apparently able to "dictate them back to his therapist." Richard wanted Timothy to be able to identify his therapy goals to her so that she knew he understood "why he's in therapy and what the purpose of his mental health

is." On cross-examination, Richard testified that Timothy's therapist told her that Timothy engaged really well in therapy and could convey his therapy goals back to the therapist.

Additionally, although there was no prolonged period over the course of this case when Timothy was unemployed, Richard said Timothy had had three different jobs since December 2022. He was behind on rent and other bills when they met in January 2023, and she was concerned that without stable, consistent employment he would not be able to provide for the children and their needs. In March, Richard completed two budgets with Timothy, "a monthly budget for the month of March and a what-if budget on what his income and expenses would look like with reunification occurring." Based on the budget, Timothy was able to meet his own needs, with a surplus of $90; he would be short every month if the children were in his care. Timothy was looking for additional employment.

Richard opined that it was in the children's best interests to terminate Timothy's parental rights because he had "shown very little progress in the long time that this case has been open." When it was pointed out that she previously said Timothy was making "fair progress," but now said he was making "very little" progress," Richard responded that she "saw them as kind of equal."

JUVENILE COURT'S DECISION

In an order entered on June 14, 2023, terminating Timothy's parental rights to Rosa and Hunter, the juvenile court found that statutory grounds existed pursuant to § 43-292(2), (6), and (7), and that termination of Timothy's parental rights was in the children's best interests.

Timothy appeals.

ASSIGNMENTS OF ERROR

Timothy assigns, restated, that the juvenile court erred in finding that statutory grounds exist to terminate his parental rights under § 43-292(2) and (6), and that termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Timothy's parental rights to Rosa and Hunter under § 43-292(2), (6), and (7). The juvenile court found that all three of those grounds existed by clear and convincing evidence. Although Timothy challenges the court's finding regarding § 43-292(2) and (6), he does not dispute that § 43-292(7) was sufficiently proven. On our de novo review, we agree that § 43-292(7) was sufficiently proven as to Rosa, but we find that it was not sufficiently proven as to Hunter.

- 10 -

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Rosa was removed from parental care in June 2020, and Hunter was removed in June 2021; both children remained in foster care after removal. By the time the motion to terminate parental rights was filed on August 24, 2022, Rosa had been in an out-of-home placement for 26 months, thus the 15-out-of-22 months' period was clearly satisfied for her. However, Hunter had only been in an out-of-home placement for 14 months, thus the 15-out-of-22 months' period was not satisfied for him. Accordingly, we must look to one of the other alleged statutory bases to terminate Timothy's parental rights to Hunter.

Section 43-292(2) provides for termination of parental rights when the parent has substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "'"A parent may as surely neglect a child of whom [he or] she does not have possession by failing to put [himself or] herself in a position to acquire possession as by not properly caring for a child of whom [he or] she does have possession."'" *In re Interest of Elizabeth S.*, 282 Neb. 1015, 1025-26, 809 N.W.2d 495, 504 (2012) (citations omitted) (brackets in original).

Timothy's involvement with the juvenile court goes back to 2018, when three of his older children were removed from parental care because of concerns of abuse. He was unable to reunify with those children, and after the State sought to terminate his parental rights to those children, he ultimately relinquished his parental rights. Rosa and Hunter were removed from parental care before being released from the hospital following their births and have remained in foster care ever since. Timothy continued a relationship with Gina for almost a year after Hunter's birth, even living with her for a time, despite being told that it would affect his ability to reunify with his children. And Timothy reported that he would let the children see Gina if reunification occurred. Timothy failed to recognize that Gina, and his brother William, were not appropriate people to have around his children. In addition, Timothy cancelled, failed to confirm, or was a no show for numerous visits with Hunter (and Rosa), and never progressed beyond 9 hours of supervised visitation each week. Timothy did not attend all the medical appointments for the children, who both have special medical needs, nor did he get the children to their appointments on time, causing the providers to request that the foster parents transport the children to appointments. By his own actions and choices, Timothy failed to put himself in a position to acquire possession of Hunter (and Rosa). See *In re Interest of Elizabeth S., supra*.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Timothy's parental rights to Rosa, and § 43-292(2) exists as a statutory basis for terminating Timothy's parental rights to Hunter. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

We acknowledge that Timothy has participated in many court-ordered services. However, in addition to the issues noted above, the record reflects that Timothy was not able to demonstrate his ability to parent his children without assistance and supervision and he was unable to demonstrate an understanding of the children's medical conditions. Both Wilson and Richard opined that it was in the children's best interests to terminate Timothy's parental rights. At the time the termination hearing commenced, Rosa had been in an out-of-home placement for 32 months, and Hunter had been in an out-of-home placement for 20 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Rosa and Hunter deserve permanency. And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the children's best interests require termination of parental rights. See *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Timothy was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Timothy's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Timothy's parental rights to Rosa and Hunter.

AFFIRMED.